Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ROGELIO RODRIGUEZ and )(
ELIZABETH RODRIGUEZ )(
        )(
    Plaintiffs )(
        )(
vs.     )( CIVIL ACTION NO B-04-137
        )(
JAMES ARTHUR LARSON )(
        )(
    Defendant )(

ORAL AND VIDEOTAPED DEPOSITION OF
JORGE TIJMES, M.D.
JUNE 21, 2005

ORAL AND VIDEOTAPED DEPOSITION OF JORGE TIJMES, M.D., produced as a witness duly sworn by me at the instance of the plaintiffs Rogelio Rodriguez and Elizabeth Rodriguez, taken in the above-styled and numbered cause on June 21, 2005, before THURMAN J MOODY, Certified Shorthand Reporter No. 2861 in and for the state of Texas, at the offices of the witness, 320 North McColl Road, Suite A, McAllen, Texas, pursuant to the Federal Rules of Civil Procedure.

Page 2

1           APPEARANCES
2  FOR THE PLAINTIFFS ROGELIO RODRIGUEZ AND ELIZABETH RODRIGUEZ:
3     RANDALL P CRANE
      LAW FIRM OF RANDALL P CRANE
4     201 South Sam Houston
      San Benito, Texas 78586
5
   FOR THE DEFENDANT JAMES ARTHUR LARSON:
6
      RALPH M RODRIGUEZ
7     DUNN, WEATHERED, COFFEY, RIVERA, KASPERITIS & RODRIGUEZ
      611 South Upper Broadway
8     Corpus Christi, Texas 78401
9  ALSO PRESENT:
10    ARTEMIO CACERES, JR., Videographer
11           INDEX
12 Appearances ................................... 2
13 JORGE TIJMES, M D
   Examination
14    By Mr. Crane ............................ 3
      By Mr. Rodriguez ....................... 31
15    By Mr. Crane ........................... 57
16 Reporter's Certificate ....................... 61
17        E-X-H-I-B-I-T-S
18 No.   Description          Identified
19  1  Curriculum Vitae ................................ 5
    2  Statement of Account, Southern Bone & Joint Center ...25
20  3  Xerographic copy of plate of vertebral column ........ 32
    4  VBMC Emergency Room Records ........................... 43
21  5  Drawings to mark showing pain, etc. .................. 61
    6  Radiologist report ................................... 61
22  7  Statement of Account, Medical Imagers ................ 61
    8  Statement of Account, VBMC ........................... 61
23  9  Health insurance claim form .......................... 61
   10  Statement of Account, Southern Bone & Joint Center ...61
24
25

Page 3

1       MR. RODRIGUEZ: Before we start the deposition,
2  Ralph Rodriguez on behalf of the defendant.
3       We are -- we have not filed a motion to quash
4  this deposition, however we would like to reserve the right to
5  object to the use of the testimony of the of Dr. Tijmes at the
6  time of trial based upon failure of plaintiff to timely and
7  properly designate Dr. Tijmes as an expert as required by Rule
8  26(a) of the Federal Rules.
9           JORGE TIJMES, M.D.
10 having been first duly sworn, testified as follows:
11          EXAMINATION
12 BY MR. CRANE:
13     Q. Dr. Tijmes, my name is Randal Crane; I'm the attorney
14 for the plaintiff who is Rogelio Rodriguez who I understand is
15 a patient of yours?
16     A. Yes, sir.
17     Q. Would you introduce yourself to the jury, please?
18     A. I'm Jorge Tijmes. T-I-J-M-E-S.
19     Q. And you are Dr. Tijmes; is that correct?
20     A. Yes.
21     Q. Doctor, could you tell us something about your
22 medical school training?
23     A. The CV is part of the exhibit, or probably will be,
24 and I was born and raised in South America, Chile. Did my
25 M.D. degree in Santiago, Chile.

Page 4

1       The following year after the licensing in 1968 I
2  followed two years of orthopaedic surgery at the capital in
3  Santiago and went three years to the province to practice the
4  specialty.
5       And after that I did receive the positive result
6  on the ECFMG exam that I gave to enter this country to
7  practice as a resident.
8       I went to the residency at Baylor College of
9  Medicine in Houston, Texas. I remained there in Houston until
10 1989. I had office private practice there in Houston.
11      And 1979 I was board certified in orthopaedic
12 surgery. In '89 I closed practice and had a contract with the
13 University of Concepcion, Chili. I was assistant professor of
14 trauma, mainly spine trauma, at the University. And that
15 contract elapsed in two years, and in 1991 came to the States;
16 came to McAllen, Texas, and have been here ever since.
17     Q. Doctor, you have provided us with a curriculum vitae
18 that essentially repeats what you have just told us, does it
19 not, with some more information also?
20     A. Yes. There's some just memberships and
21 presentations, etcetera.
22     Q. And that's a true and correct copy and up-to-date
23 curriculum vitae of yourself; is that correct?
24     A. Yes, it is.
25         MR. CRANE: We're going to ask that this be

Page 5

1 marked as Deposition Exhibit No. 1 and be attached to the
2 deposition.
3     (Exhibit No. 1 marked.)
4 Q. (By Mr. Crane:) Doctor, you mentioned a couple of
5 things I'd like you to go into a little more. You said that
6 you are an orthopaedic surgeon; is that correct?
7 A. Yes.
8 Q. What exactly is an orthopaedic surgeon?
9 A. The orthopaedic surgery is that branch of medicine
10 that treats, studies and investigates the illnesses of bones,
11 ligaments and joints.
12 Q. And you also said that you were board certified.
13 What is the relevance of being board certified?
14 A. The board certification is given by the head of the
15 specialty, in this case the American Academy of Orthopaedic
16 Surgery, and this is a body of academicians that give the
17 board certification after several examinations.
18 Q. So you can be an orthopaedic surgeon without being
19 board certified?
20 A. Yes.
21 Q. But board certification would just mean that you have
22 done additional testing and training and --
23 A. Essentially it's a wrap-up type of exam that you give
24 after the regular US approved residency state from the, I
25 think ACC and the American College of Medical Specialties.

Page 6

1 They have to ratify that that particular residency is accepted
2 by that body of academicians and the particular student then
3 goes through the testing after he has given the okay by all
4 the professors that he goes through during the residency.
5 Q. Okay. Doctor, as I understand it, you have seen as a
6 patient Rogelio Rodriguez; is that correct?
7 A. Yes.
8 Q. And can you tell us when it was that you first saw
9 Mr. Rodriguez?
10 A. Mr. Rodriguez was seen first November 11th, 2003.
11 Q. Couple of other things before I get into
12 Mr. Rodriguez I forgot to ask you.
13     Are you currently on the staff of any of the
14 local hospitals?
15 A. Yes, I am.
16 Q. Which hospitals are those?
17 A. The hospitals I'm active at is McAllen Medical
18 Center, HCA Regional Hospital, Doctors at Renaissance Hospital
19 and several outpatient surgical centers.
20 Q. And you have never had your staff privileges
21 suspended at any of those hospitals, have you?
22 A. No, I have not.
23 Q. And you are, of course, a licensed physician in the
24 State of Texas?
25 A. Yes, I am.

Page 7

1 Q. Have you ever had your medical license suspended for
2 any reason?
3 A. No I have not.
4 Q. Or probated?
5 A. No.
6 Q. Doctor, going back into Mr. Rodriguez, you told us
7 when you first saw him was on what date?
8 A. Yes. It was November 11th, 2003.
9 Q. And do you know how it was that he happened to come
10 to your office?
11 A. He was referred to this office and I saw him November
12 11th, 2003, from what I remember is that -- let's see.
13     When was the referral here? Somewhere.
14     I do believe he was seen by Dr. Gill and he
15 had -- let's see.
16     It can be that he was referred by Dr. Gill at
17 that time.
18 Q. Okay. When Mr. Rodriguez came to your office did you
19 take a medical history from him?
20 A. Yes.
21 Q. And what is the purpose of taking a medical history?
22 A. To have an accurate account of the events that leads
23 to the different pain levels and different areas of the body.
24 Q. And what was the medical history that was related to
25 you by Mr. Rodriguez?

Page 8

1 A. At that point in time he related that he had neck
2 pain, right shoulder pain, mid back pain and low back pain.
3     He related that he was involved in a motor
4 vehicle accident collision on or about 1/16/2003.
5 Q. Okay. And after you were done taking a history from
6 Mr. Rodriguez did you then go on to perform a clinical
7 examination?
8 A. Yes.
9 Q. And is that the next thing you did after getting the
10 history, is do a clinical?
11 A. Yes.
12 Q. What did your clinical examination consist of,
13 Doctor?
14 A. At that time he was having weight of 218, height five
15 and nine. He had a normal head exam; the eyes, ears, nose and
16 throat were normal.
17     The neck had tenderness to palpation to the
18 muscles between the neck area and shoulders. The ranges of
19 motion of the neck were decreased due to pain and discomfort.
20     At upper extremity exam, he had normal ranges of
21 motion to the left shoulder, both elbows and both wrists.
22     The exam of the right shoulder revealed
23 tenderness to the front and lateral aspect of the right
24 shoulder. Active ranges of motion were decreased in sideways
25 motion and forward motion to the right shoulder.

Page 9

1  The rotations were also decreased to the right
2  shoulder.
3  The neurological exam was within normal limits
4  with normal reflexes at upper extremities.
5  The upper back revealed tenderness to palpation
6  at the mid back section. The low back exam revealed muscle
7  spasms as he bent forward with decreased ranges of motion
8  forward bending.
9  The leg examination revealed tightness to the
10 posterior aspect of thigh and calf, which is called straight
11 leg raising, which was positive to the right to seventy
12 degrees.
13 Distal sensation and circulation was normal.
14 Deep tendon reflexes was normal.
15 Motor testing was decreased to the right
16 compared to the left one.
17 The physical exam then revealed pain to the
18 neck, right shoulder, upper back and low back.
19 Q. Did anything in the clinical examination that you
20 performed give you any idea in laymen's terms of what this
21 man's problems might be? Were you able to draw any
22 conclusions at that point?
23 A. The exam was done a good ten months after the
24 accident, and even at that time he had tender areas, pain to
25 the shoulder, neck and low back.

Page 10

1  So this is a time frame where we usually think
2  that just a simple sprain is able to improve by it itself and
3  therefore we were suspicious about the etiology of the pain.
4  Q. By etiology you mean?
5  A. The reason of the pain.
6  Q. I see. Did you go on, then, Doctor, to do any
7  additional studies?
8  A. Yes.
9  Q. What type of additional studies did you do?
10 A. At that point in time we did simple plain x-rays of
11 the cervical spine, which is the neck; thoracic spine, which
12 is upper back; lumbar spine, which is the waist line, and
13 right shoulder.
14 Q. And what, if anything, did those x-rays reveal to
15 you?
16 A. The x-rays of the cervical spine, which is the neck,
17 revealed normal lordosis. That means that the curvature, the
18 forward curvature of the neck, was normal.
19 The distance between the different bones from
20 one to seven was normal. That means the disc spaces were
21 pretty much preserved. There was no foramina encroachment.
22 That means that the small little tunnels through which the
23 nerves go out from the cervical spine down to the shoulder was
24 not involved with any type of arthritis. No fractures, no
25 dislocations were seen.

Page 11

1  The x-rays of the upper back, thoracic spine,
2  revealed normal kyphosis. And that's a sideways morphology
3  which depicts a certain curvature of the upper back, which is
4  normal.
5  The x-rays of the lumbar spine, which is the
6  waistline, revealed five lumbar vertebral bodies, those are
7  the square vertebral bodies forming the lumbar spine, there
8  was normal alignment, the spaces were preserved. That means
9  the spaces between the different bones are preserved without
10 any evidence of decreased height.
11 Lumbar facets were seen. That means that the
12 lumbar joints that permit us to bend forward and sideways were
13 without osteoarthritic changes. There were no fractures, no
14 dislocations.
15 X-rays of the right shoulder in two different
16 views, which is the front and latera, revealed a down looping
17 acromion. And the acromion is a small bone tong that comes
18 from the back part of the scapula, which is the shoulder
19 blade. And this one -- usually when we see this usually may
20 be able to produce an impingement. That means pinching the
21 muscle between the lower bone, which is the arm bone, and the
22 upper bone, which is the acromion. Otherwise no fractures, no
23 dislocations were seen.
24 Q. Doctor, you have used some terms I really don't
25 understand. Would you have any sort of models here in your

Page 12

1  office that we might be able to use to explain to the jury
2  what you're talking about when you're talking about vertebras
3  and foramina and that sort of thing?
4  A. Yes. I may be able to get them if we have a short
5  recess.
6  MR. CRANE: Okay. Could we take a recess and do
7  that? Thank you.
8  (Short pause.)
9  MR. CRANE: Back on the record.
10 Q. (By Mr. Crane:) Okay, Doctor, we took a short break
11 so you could get some examples we might use as we go along to
12 explain to the jury some of the terms that you're using.
13 Let me ask you first about x-rays. What type of
14 things do you expect to see when you look at an x-ray? I mean
15 what, does it show you muscles and nerves or does it primarily
16 show hard structures such as bones? What do you see?
17 A. The plain x-rays actually show bones in relationship
18 of bones. The other imaging that we call MRI show soft
19 tissue. So essentially plain x-ray show bones and their
20 relationships.
21 Q. And would it be correct or would it not be correct
22 that you can -- your bones can be normal and you can still
23 have problems that an x-ray would not show up?
24 A. Yes. That is a possibility. So bones essentially
25 can be normal in a sense that the sequence and the arrangement

Page 13

1  of those bones in relationship to each other are normal, but
2  the soft tissue may be abnormal.
3    Q. Okay. After you had taken the x-rays did you feel
4  that additional diagnostic testing was necessary?
5    A. Yes.
6    Q. And did you, in fact, prescribe additional diagnostic
7  testing?
8    A. Yes.
9    Q. And what testing did you prescribe?
10   A. At that time we ordered an MRI to the cervical spine.
11 That means the neck.
12   Q. Okay. And once again we talk about the cervical
13 spine; what area are we talking about?
14   A. You're talking about the area below the hairline up
15 to the chest.
16   Q. Is that what you would normally refer to as the neck?
17   A. The neck, right.
18   Q. Okay. And were cervical MRIs actually done on
19 Mr. Rodriguez?
20   A. Yes.
21   Q. And have you had an opportunity to review the MRIs
22 themselves?
23   A. Yes.
24   Q. And have you also had those MRIs read by a
25 radiologist?

Page 14

1    A. Yes.
2    Q. And did you review that radiologist's report?
3    A. Yes.
4    Q. Let's see if I can find that. And that was a report
5  that was read by a Dr. Berger?
6    A. Yes.
7    Q. In that report, and I'm looking at the one dated --
8  the report by Dr. Berger dated 11/13/03, the report talks
9  about the C3/C4.
10       What is the C3/C4?
11   A. C3/C4 stands for cervical number three, cervical
12 number four. The first one is the upper and number seven is
13 the lower one.
14   Q. Okay. Let me ask you, with the models that you
15 brought in, could you show myself and the jury what a cervical
16 is when you are talking C3/C4?
17   A. The cervical is at the upper level of the neck. And
18 this is between three and four. These are actual pictures of
19 skeletons depicting nerves and muscles. And this is number
20 one, number two, number three, number four, number five,
21 number six, number seven. And then this is T1 that has the
22 first rib attached to this one. So this is --
23   Q. Turn that so the camera can see it, if you would,
24 Doctor.
25       Can you pick that up?

Page 15

1       THE VIDEOGRAPHER: Yes, sir.
2    A. The -- let's do move this here.
3       Is this easier to see?
4       THE VIDEOGRAPHER: Yes.
5    A. So this is a skull. Number one, number two, number
6  three, number four, five, six and seven, and this is the first
7  rib going to the thoracic.
8       So if this is one, then this is between three
9  and four, and this area here, which is soft tissue, this is
10 part of the anterior border of the disc which obviously goes
11 all the way to the back and these are the yellow nerves
12 depicted at the exit of each bone. And they form --
13 underneath the clavicle they form a bundle, which is the
14 plexus going into individual muscles down the arm.
15       So between three and four would be in this area
16 here.
17   Q. Okay. And in this report that was prepared by
18 Dr. Berger, he says that there's a two millimeter central to
19 right central broad-based disc protrusion with sub total
20 effacement of the CSF anterior to the cord.
21       What in the world does that mean?
22   A. That means that the disc is intruding into the canal,
23 and the canal is behind the cervical bone there.
24       If we take into account the canal -- for example
25 this is a lumbar canal. If we take out all the bones in the

Page 16

1  back, and we're talking about the lumbar, so just to depict
2  that the nerves are bigger here, the nerves are then touched
3  at each level by the abnormal disc when this disc is in a
4  abnormal position, which is a disc C3/C4 that is having a
5  protrusion.
6    Q. Okay. And then the report goes on and basically says
7  that there were disc protrusions of various sizes on C3 dash 4
8  through C6 dash 7.
9       What exactly is Dr. Berger saying there?
10   A. He is meaning to say that all the discs were
11 abnormally big, having a bulge in excess of what he would
12 consider a normal disc description.
13   Q. And, Doctor, I'm going to ask you some questions that
14 will require you to rely on your training as a doctor and your
15 education in the medical field.
16      When I ask you those type of questions will you
17 base your answers on reasonable medical probability?
18   A. Yes, I would.
19   Q. Can you tell me if disc protrusions, such as those
20 seen in Mr. Rodriguez' neck in the MRI, if protrusions such as
21 that can be the result of traumas such as the automobile
22 accident which Mr. Rodriguez was involved on January the
23 sixteenth of 2003?
24      MR. RODRIGUEZ: Objection; form.
25   A. Yes, they can.

### Page 17

1  Q. (By Mr. Crane:) And can you tell us whether or not
2  you have an opinion as to whether Mr. Rodriguez' injuries or
3  protrusions we're talking about were the cause of that
4  incident?
5      MR. RODRIGUEZ: Objection; form.
6  A. Within reasonable medical probability it's my opinion
7  that bulges that Mr. Rodriguez has on these MRIs were trauma
8  related to the 1/16/2003 injury.
9  Q. (By Mr. Crane:) Okay. And Dr. Berger goes on to say
10 that there is subtotal opacification of the left maxillary
11 antrum and moderate mucosal thickening of the base of the
12 right maxillary antrum.
13     What is he telling us there?
14 A. Essentially the MRI does not stop at the first
15 cervical bone; it goes on to depict the maxillary sinus and
16 this means that he has a chronic sinusitis there.
17 Q. Okay. Now, would that be related in any way to the
18 accident?
19 A. No.
20 Q. Okay. This is just another finding that was seen
21 when the study was done?
22 A. Yes.
23 Q. All right. In addition to the cervical MRI that you
24 have just discussed with us, did you do any additional
25 diagnostic testing?

### Page 18

1  A. The additional diagnostic testing were done as part
2  of the physical exam.
3      We did review MRIs of the lumbar spine.
4  Q. Okay. And when you say the lumbar spine, once again
5  you're referring to which part of the back?
6  A. This is the waistline.
7  Q. Okay. And what were the results of the MRI of the
8  lower back?
9  A. This MRI was done 10/8/2003, ordered by Dr. Gill and
10 read by Dr. Bennos, M.D., a radiologist. At this point in
11 time he refers that there is no evidence of herniation,
12 central spine stenosis or foramina stenosis at L1/L2, L2/3.
13     At L3/4 he describes a one millimeter disc
14 protrusion narrowing the ventral epidural fat and having a
15 nerve foramina five percent narrowing on both sides.
16 Q. Doctor, --
17 A. That's it.
18 Q. -- before you go on, could you possibly take up that
19 plastic model that you brought to us and use it to describe to
20 the jury what we're talking about here?
21     Before you do that, is that model a fair
22 representative of a -- the lumbar spine that you would find in
23 a human?
24 A. This is a plastic representation, and the size is
25 smaller than a true lumbar spine. But it does represent the

### Page 19

1  relationship between the bones above and the disc below. It
2  does give us an idea about the triangular space that we have
3  behind.
4      And the yellow represents the cord and the
5  smaller yellows represent the nerves coming out of the
6  foramina. Foramina is nothing else than a small tunnel given
7  by the upper bone and by the lower bone. And so any problems
8  with the disc here will relate to either the joints in the
9  back or the exit of the nerve roots in the front.
10 Q. Okay. And, Doctor, would this model be helpful to
11 you in explaining to the jury the MRI findings of Mr.
12 Rodriguez' lower back?
13 A. This model is not to scale. It would definitely be
14 able to explain the relationship between the different
15 elements, which is soft tissue. That means the disc space in
16 between the bones and the exit of nerve roots that goes along
17 between each bone.
18     As we relate to the triangular segment of space
19 behind these vertebral body, which is in front, we can infer
20 that any type of protrusion of the disc backwards then would
21 either touch or be in continuity with the cord or with the
22 nerves. It depends if it's central or if it's in the
23 periphery of the disc.
24 Q. Okay. Doctor, now, how does that model that you
25 have, how would that sit in your body if -- which is the front

### Page 20

1  of it?
2  A. The front would be the bones in the front like we are
3  setting at the present, and this would be the front area like
4  the abdomen and the small little bones in the back would be
5  close to the skin at the lumbar spine.
6  Q. And that blue portion between the bones, what is that
7  called?
8  A. This is the disc.
9  Q. And is that -- I think you told us earlier that is a
10 soft tissue, that is not a bone?
11 A. Correct.
12 Q. Okay. And when that disc protrudes what does it do?
13 A. It usually is in continuity or very much close to the
14 area where the CSF is, which is central spinal fluid.
15     So around these yellow structures, which are
16 nerves, the fluid is being -- around this nerve structure and
17 the CSF is nothing else than a column of fluid involved with
18 membranes.
19     And the disc obviously is either normal or
20 abnormal. And in this case it's either in direct continuity
21 or contiguity to the nerve structures in the back of the
22 lumbar spine.
23 Q. And when that disc presses on that yellow part, what
24 you call the nerve, what is the result of that?
25 A. When the -- when the disc space is very big, let's

Page 21

1 say if we consider this is the skin and this is the abdomen,
2 this is a cross section of the lumbar spine, if we consider
3 that the disc is adopting this type of periphery, it will
4 impinge on this triangular portion if the disc then goes on
5 and goes beyond this ligament structure.
6     And if it does, it depends if the center part of
7 the disc goes out and is touching the central portion of the
8 nerves or not, in order to call it a bulge or to call it a
9 herniation. And there's several structures that are giving us
10 the symptoms like pain, like a central protrusion or
11 herniation can give us low back pain, and a lateral herniation
12 can give us leg pain, since these are the exits of the nerves
13 on both sides.
14   Q. So would the disc protrusion, in your opinion,
15 explain the pain that Mr. Rodriguez complains about in his
16 lower and cervical spine?
17   A. The pain that he has had to neck and low back can be
18 explained by disc protrusions or disc irritation onto the
19 nerve structures that he has around -- surrounding the discs.
20   Q. Also looking at the report by Dr. Bennos, he talks
21 about the neural exit foraminal stenosis. He says that
22 there's is a -- as I read it, an inner zonal fat of the neural
23 exit foramina that is swollen. He talks about an edema; am I
24 understanding that correctly, or what is he saying?
25   A. He is saying that if we take -- let's say we take

Page 22

1 this number four lumbar and number five lumbar, just to give
2 it a number, and obviously number one should be above and
3 number five is below, the disc that is between four and five
4 has such a protrusion that is touching or giving the foramina,
5 which is the tunnel between four and five, giving the tunnel a
6 different dimension. That means that there is an obstruction
7 to the exit of this nerve root. He calls it thirty percent
8 obstructed.
9   Q. Okay.
10   A. And edema is a fact of the MRI which is only seen on
11 MRI, which means swelling of the nerve root.
12   Q. And when you have those conditions does that -- can
13 you tell me whether or not that results in pain?
14   A. Usually it's origin of pain.
15   Q. Okay. And can something of this nature be corrected
16 surgically?
17   A. It can be corrected with medications more than
18 surgically. The evidence of herniation at that level is less
19 clear as to a true herniation. That means L4/5, being
20 described as having a protrusion, will most likely not render
21 itself to surgical treatment unless we know for a fact that
22 that is a painful disc.
23   Q. Is this condition in Mr. Rodriguez a permanent
24 condition?
25   A. It can be and, in his case, it most likely will be.

Page 23

1   Q. So would it be fair to say that we could expect him
2 to continue to suffer pain and -- as he continues through
3 life?
4   A. Within reasonable medical probability, yes.
5   Q. Okay. And would you put restrictions on someone who
6 has the physical findings that you have found in
7 Mr. Rodriguez?
8   A. That is related to the difficulties of activities of
9 daily living. I would put restrictions on somebody suffering
10 from this type of pain after a functional capacity evaluation
11 has been performed.
12     And, in my opinion, if he has had this type of
13 pain pattern without any resolution, I would dare to say that
14 he would be on the medium type of job description on the PDC
15 level.
16   Q. What -- sorry, I don't understand exactly what you
17 meant by that. The medium range level. I lost you there.
18   A. The classification of job, of physical job, pushing,
19 pulling, carrying, sitting and standing would give us either a
20 light-duty, medium-duty or full-duty without restriction.
21     I'm saying that with a functional capacity
22 evaluation, coupled with these symptoms that do not get
23 corrected in time by either medications or pain clinic, pain
24 injections, then I would place a medium work description and
25 restriction on his job.

Page 24

1   Q. Okay. Would you restrict him from such things as a
2 lot of walking?
3   A. The walking and standing would not be restricted, but
4 mainly restriction in relationship to the bending, stooping,
5 pushing, pulling and carrying over fifty pounds would be
6 restricted.
7   Q. Okay. Now, I don't know if you recall or not from
8 your conversations with Mr. Rodriguez, but he makes his living
9 as a truck driver, he drives an 18-wheeler.
10     Is that something that would cause him problems
11 if he continues to do that?
12   A. We don't know what the future will bear on these pain
13 producing elements like discs protrusions of the cervical or
14 lumbar spine. The body changes in time and it is very
15 difficult to predict what type of problems he might expect.
16 If the pain, like I say, does not decrease or improve I would
17 dare to say a functional capacity evaluation will give us a
18 much better view of what he can do or cannot do.
19   Q. But would it be fair to say that you would restrict
20 him from doing anything that causes him increased pain and
21 discomfort?
22   A. Yes, I would.
23   Q. Doctor, let me ask you a couple of questions. Your
24 bills in this case have been how much, do you know?
25   A. The financial is part of the copies that we have had

Page 25

1 there.
2 Q. If I may then, let me show you this bill from your
3 office, and I will mark it as Exhibit No. 2.
4        (Exhibit No. 2 marked.)
5 A. Okay.
6 Q. (By Mr. Crane:) And you ask you if you recognize
7 those as your charges?
8 A. Yes.
9 Q. Can you tell me if those are the fair and reasonable
10 charges for those services in Cameron County and Hidalgo
11 County?
12 A. Yes, they are.
13 Q. And you felt that those were probably -- the
14 necessity for those charges were caused by the accident that
15 Mr. Rodriguez was involved in on 1/16/2003?
16 A. Yes, they were.
17 Q. Doctor, I also have a bill here from the Medical
18 Imaging Center in the amount of one thousand eight hundred and
19 fifty dollars. Would you take a look at that bill, please.
20 A. Yes.
21 Q. Are you familiar with the fair and reasonable charges
22 for doing MRIs in this area?
23 A. Yes, I am.
24 Q. And could you tell us whether or not those are the
25 fair and reasonable charges for those services?

Page 26

1 A. In my opinion they are fair and reasonable charges
2 for the MRI of the cervical spine.
3 Q. Okay. And, once again, you believe that that MRI was
4 necessitated as a result of the accident of 1/16/2003?
5 A. Yes, in my opinion it was.
6 Q. Doctor, I'd next like to show you a bill from Valley
7 Baptist Medical Center which is a hospital to which
8 Mr. Rodriguez was taken by ambulance after the accident.
9        That bill is in the amount of three thousand one
10 hundred and twenty-four dollars and sixty cents.
11        Are you familiar with the charges of the various
12 hospitals in the area?
13 A. Yes, I am.
14 Q. Can you tell me if that would be a fair and
15 reasonable charge for those services?
16 A. In my opinion they are fair and reasonable in order
17 to treat him in the emergency room and admit him for three
18 days.
19 Q. Okay. And, once again, you believe that those were
20 necessitated as a result of the accident of -- 3 -- of
21 1/16/2003?
22 A. Yes, in my opinion it was.
23 Q. And then, Doctor, we will also have a bill from Rio
24 Grande Valley Imaging, and that bill is in the amount of
25 fourteen hundred dollars. That's where they did the MRI of

Page 27

1 the lumbar.
2        Once again, you're familiar with the fair and
3 reasonable charges for those services?
4 A. Yes, I am.
5 Q. And are those fair and reasonable charges for the MRI
6 of the lumbar spine?
7 A. Yes, in by opinion they are.
8 Q. Okay. And do you feel that that MRI was necessitated
9 by the accident of 1/16/2003?
10 A. In my opinion it was, yes.
11 Q. And finally, Doctor, I'd like to show you the bill
12 received from Dr. Bennos for his reading of the lumbar MRI in
13 the amount of three hundred dollars.
14        Are you familiar with the charges of the various
15 doctors who read MRIs?
16 A. Yes, I am.
17 Q. And is three hundred dollars a fair and reasonable
18 charge for the services performed by Dr. Bennos?
19 A. Yes, in by opinion it is.
20 Q. And, once again, that was necessitated by the
21 1/16/2003 accident?
22 A. Yes, in my opinion it was.
23 Q. Thank you, Doctor.
24        Doctor, do you feel that, once again, based on
25 reasonable medical probability, that Rogelio Rodriguez will

Page 28

1 require additional medical treatment in the future?
2 A. Within reasonable medical probability I would say
3 that if the pain persists and he is still symptomatic he will
4 require further treatment.
5 Q. And what type of treatment, future medical treatment,
6 do you believe that he will require?
7 A. The main treatment would be the pain medications and
8 muscle relaxers if this pain continues. The other factor we
9 have to consider is diagnostic testing.
10 Q. What type of diagnostic testing?
11 A. At this point we have a young man that complains
12 about neck pain, some arm discomfort, low back pain, and the
13 testing that would be necessary to improve his treatment would
14 be a neurological examination, a nerve conduction study, EMG
15 called or ENT, a nerve velocity study which is an NCV.
16 Q. What would the cost of that type of diagnostic
17 testing be?
18 A. The usual customary cost for that would be seven
19 hundred dollars for a neurological exam and EMG and NCV.
20 Q. Also you talk about pain medication and relaxants.
21 That will require Mr. Rodriguez seeing a doctor so he can
22 prescribe that medication, correct?
23 A. Yes.
24 Q. What would a doctor's visit normally cost for someone
25 such as Mr. Rodriguez?

Page 29

1   A. In my opinion he would need doctor's visits for the
2   next two years at about six visits a year at a cost of eighty
3   dollars each.
4   Q. And then the medications, any idea what those would
5   run?
6   A. Within medical -- reasonable medical probability the
7   medication will run two hundred dollars a month.
8   Q. And he will need those medications, you said, for the
9   next two years?
10  A. Yes.
11  Q. Okay. Doctor, I have heard of another diagnostic
12  test called a discogram.
13       Can you tell me whether or not a discogram is
14  something that you believe will be necessitated in
15  Mr. Rodriguez' case?
16  A. A discogram is a diagnostic test which is an
17  injection to the disc. And the space between the bones which
18  is occupied by a disc is then pierced under local anesthetic,
19  it's pierced by the radiologist or the pain clinic management
20  team, it's pierced by an injection that consists of a simple
21  dye. The dye usually pools in the center of the disc which is
22  on or about in this area. Sometimes the dye then travels out
23  and when it travels out it is an indirect measure of a rupture
24  of certain type fibers. And we see that often in cases of
25  bulging discs.

Page 30

1   And so the discogram is an indirect proof of a
2   bulging disc that is ruptured and it is a direct proof of a
3   painful disc if the patient has this test done under local
4   anesthetic only.
5   Q. Okay. Is that something that you would recommend in
6   Mr. Rodriguez' case?
7   A. If he considers that the pain is still an ongoing
8   symptom, I would consider a lumbar discogram, yes.
9   Q. And what would the cost of that be?
10  A. This discogram is done as an outpatient with a
11  surgical fee of the operating room of three thousand dollars,
12  anesthesia fee for the monitored anesthesia through the vein
13  of five hundred dollars, and a surgical or technical fee of a
14  thousand dollars, with a reading of the CAT scan that is
15  followed by the discogram, the reading is three hundred
16  dollars. And the cost of a CAT scan after the discogram is
17  fifteen hundred dollars.
18  Q. I'm not very good at math, but it seems like all of
19  that added up to about sixty-three hundred dollars.
20       Does that sound about correct?
21  A. That seems reasonable, yes.
22  Q. Okay. Now, did you say that is something he should
23  consider or something that if he is continuing problems you
24  would recommend based on reasonable medical probability?
25  A. Within reasonable medical probability he should

Page 31

1   consider, due to the chronic pain that he is perceiving.
2   Q. Okay. One other question I forgot to ask you earlier
3   when we were talking about these symptoms.
4        Even if the disc itself does not press on the
5   nerve that exit foramina or go down the back behind the disc,
6   can a disc leak the fluid that is contained within them?
7   A. Yes. When the fibers are ruptured in the back of the
8   disc then the leakage of fluid produces an inflammatory
9   reaction and secondary pain.
10  Q. And so even that you may not have a complete
11  herniation you can have breaks in the disc material that
12  allows this material to irritate the nerves?
13  A. Yes.
14  Q. And this is going to cause pain?
15  A. Yes.
16       MR. CRANE: Okay. Pass the witness.
17            EXAMINATION
18  BY MR. RODRIGUEZ:
19  Q. Doctor, before we get specifically into the case here
20  on the treatment that was rendered to him before you saw the
21  patient, can we just go over just anatomy-wise how the spine
22  is set up?
23  A. Sure.
24  Q. At let's use that item there.
25  A. Okay.

Page 32

1   Q. Now, Doctor, if we have this in our back -- and that
2   is the set of discs and the bony structures?
3   A. Yes.
4   Q. Does that cover from the neck down to the low back on
5   a person?
6   A. It does.
7   Q. All right.
8   A. And this small area of four bones just is supposed to
9   cover the last four bones of the lumbar spine which is the
10  waistline.
11       (Exhibit No. 3 marked.)
12  Q. (By Mr. Rodriguez:) I'm going to give you Exhibit
13  No. 3. Does this show the spinal region of a body?
14  A. Yes.
15  Q. Including the neck, thoracic and lumbar?
16  A. Yes, it does.
17  Q. All right. And if you can pull back now the model
18  again, Doctor.
19       The discs that are between the bony structures,
20  does that allow for movement of the back?
21  A. Yes, it does.
22  Q. And does it allow for rotation of the back, that is
23  to be moved to the left, to the right, forward and backwards?
24  A. Yes.
25  Q. And over the course of time, when people age can you

Page 33

1  have deterioration of the discs between those bony structures?
2     A. Yes.
3     Q. Let's concern ourselves with the blue item there.
4        And are those the discs that we have been
5  talking about?
6     A. Yes, they are.
7     Q. All right. And are those discs composed of a core
8  that is called the nucleus pulposus?
9     A. Yes.
10    Q. And nucleus pulposus is actually like a gelatinous
11 type of core, is it not, Doctor?
12    A. Yes.
13    Q. And if you look at that core it would be composed of
14 about ninety layers of laminated collagen fibers which are
15 called annulus fibrosis?
16    A. Yes. Actually the annulus is --
17    Q. Do you have a picture of that?
18    A. Is sitting around it. So this is an axial view --
19 this way. This is axial view, that means from front to back.
20 So essentially the disc would cover the whole seat of the bone
21 in the front. And then the center would be the nucleus
22 pulposus which is the gelatin structure, and the periphery
23 would be concentric fibers that are surrounding the nucleus
24 pulposus.
25    Q. And so, Doctor, what we're saying is that the outer

Page 34

1  area here would -- because of the fibrous material is actually
2  tougher than the inner core, would you agree with that?
3     A. Yes.
4     Q. And this, even though we talk about it as being a
5  disc, this is actually a very firm item of the back similar to
6  strength of a bone?
7     A. It is very firm, yes.
8     Q. Okay. Now, can we look -- can we call, then, the
9  discs similar to a radial tire, a belted tire, to so speak,
10 with the fibrous tissues?
11    A. Yes. It could be an analogy to that.
12    Q. All right. Now, Doctor, as one ages will the discs
13 deteriorate?
14    A. Yes.
15    Q. And on an MRI can you see the deterioration on the
16 MRI film of the discs?
17    A. Yes.
18    Q. And if the MRI report indicates T signals, is that
19 something that the radiologist refers to in terms of the water
20 content as reflected on the films of the MRI?
21    A. Yes.
22    Q. And what the radiologist looks for on the T signals
23 is the disc bright white, is it gray or is it dark black,
24 would that we correct, Doctor?
25    A. Correct. They're looking for the content of water

Page 35

1  and usually the T2 image is the one that depicts more the
2  water part of the soft tissue structure.
3        So they go and determine, under the T2 image, if
4  the disc has a center that is light or a center that that is
5  dark.
6     Q. And if you have a newborn, a young person, a
7  teenager, more likely than not that person would likely have
8  bright signals on the T2 pictures of the disc, would you
9  agree, Doctor?
10    A. Yes.
11    Q. And as someone ages, perhaps in their forties,
12 fifties, sixties and seventies, that disc more likely becomes
13 darker in color because of the deterioration and the lack of
14 water in the discs as opposed to the teenager, would you
15 agree, Doctor?
16    A. Yes.
17    Q. Okay. Let me make certain statements, Doctor, and I
18 would ask you to tell me whether you agree or disagree with
19 these statements.
20       That most people over the years of thirty years
21 of age have bulges in their body?
22    A. Yes.
23    Q. And that sometimes -- that most people over the age
24 of thirty years have ruptures and herniations as well?
25    A. Statistically they can. I don't know if that is a

Page 36

1  prevalent problem in those people but they can, yes.
2     Q. Are you familiar with studies that have been
3  conducted on human bodies in which MRIs are taken of the back,
4  herniations are seen on the MRI film and yet that person does
5  not exhibit any discomfort or symptoms of pain?
6     A. Yes.
7     Q. Most herniations are degenerative in origin.
8        Would you agree with that statement?
9     A. We know that the herniations are due to an
10 accumulation of events, and it could be activities of daily
11 living, coupled with trauma or not. And so it appears to be
12 it's an accumulation of events and then one or two last events
13 gets the disc to rupture.
14    Q. When we talk about deterioration or degeneration in
15 the disc we're talking about wear and tear that a person goes
16 through daily activities of pushing and pulling and running,
17 jogging, those kind of activities, Doctor?
18    A. Yes.
19    Q. And those kind of activities over the course of
20 decades in one's lifetime can result in degeneration,
21 deterioration, wear and tear in the discs that can be seen on
22 the MRI films.
23       Would you agree, Doctor?
24    A. Yes.
25    Q. What we're saying, then, is that patients such as

### Page 37

1 Mr. Rodriguez may not necessarily have to be in a car accident
2 for the MRI film to show degeneration or deteriorations or
3 wear and tear.
4      Would you agree?
5 A. Yes.
6 Q. And if we look at the report on the lumbar and the
7 cervical there were indications by the radiologist on
8 Mr. Rodriguez that some of the conditions in the neck and the
9 lumbar were degenerative in nature, were they not, Doctor?
10 A. Some of them were.
11 Q. Okay. And what we're talking about is that that
12 degeneration that is seen on the MRI film doesn't occur in a
13 matter of weeks or months, but rather over the course of
14 years.
15      Would you agree, Doctor?
16 A. Yes.
17 Q. So if the MRI of the lumbar or the cervical of
18 Mr. Rodriguez in which there was an indication of
19 degeneration, Doctor, if we had taken those MRI films a day
20 before this car accident we would have similar findings to
21 what we have in the MRI films that are done after this car
22 accident.
23      Would you agree, Doctor?
24      MR. CRANE: Object to the form.
25 A. In my opinion that would be the case, mainly in

### Page 38

1 relationship to the desiccation of disc.
2 Q. (By Mr. Rodriguez:) That's right. What you're
3 saying is that the disc would -- had less water content in it,
4 it would be desiccated, it would be seen on the film as being
5 desiccated, being darker in color, and that likely would have
6 been present before the car accident as is now being seen in
7 the MRI film after the car accident.
8      Agreed, Doctor?
9 A. Yes. There is a possibility of that.
10 Q. Would you also agree, Doctor, with the statement that
11 in the second generation of life, that is when someone reaches
12 the -- their twenties, the discs start to lose water?
13 A. Yes.
14 Q. Eighty per of the population, Doctor, have back pain
15 at some point in their life.
16      Would you agree with that?
17 A. It is possible; yes.
18 Q. The radiologist I believe, on --
19      Do you recall whether the radiologist found any
20 osteoarthritic changes in the back, Doctor?
21 A. He recalled on the lumbar spine, this was 10/9/03,
22 revealing some facet arthropathy mid to lower lumbar spine.
23 Q. At what level was that, Doctor?
24 A. And this is on MRI. It says -- it says in number
25 three on the impression by Dr. Bennos, it says there's facet

### Page 39

1 arthropathy in the mid to lower lumbar spine range.
2      So it -- from that I would read L3/L4 area
3 indicative of degenerative change.
4 Q. So at L3/L4 there was indication of degenerative
5 changes that is akin or similar to osteoarthritis changes?
6 A. That's what it looks like that he was referring to.
7 Q. And when we talk about osteoarthritis, that's
8 something that's a natural development, not something that's
9 caused by trauma such as a car accident?
10 A. Yes.
11 Q. That takes years to develop, Doctor?
12 A. Yes.
13 Q. Do you know Dr. Abraham Cano?
14 A. Yes.
15 Q. And is he a licensed physician in the State of Texas?
16 A. Yes.
17 Q. And he is a treating physician in the Valley area?
18 A. Yes.
19 Q. Do you know him to be a reputable, competent doctor?
20 A. Yes.
21 Q. Are you aware of the sessions and treatment that this
22 patient had with Dr. Cano?
23 A. Not specifically. I know by the history given by
24 Mr. Rogelio Rodriguez that he did visit Dr. Cano.
25 Q. All right. Are you -- did you have a chance to look

### Page 40

1 at the records from the emergency room after the car accident?
2 A. No, I did not.
3 Q. You're aware that the patient went to Valley Baptist
4 emergency room?
5 A. Yes, correct.
6 Q. All right. I have the copies of the record here,
7 Doctor, and they're very hard to read, if you just follow me.
8      On the top under chief complaint, it says that
9 he was in an 18-wheeler hit by a truck that cut in from of
10 him.
11      Do you see that, Doctor?
12 A. Yes.
13 Q. Am I reading that correctly?
14 A. Yes.
15 Q. And at that time, on the day of the accident, he
16 complained of pain in the forehead, in the left side of the
17 chest.
18      Is that correct?
19 A. Yes.
20 Q. And under diagnostic impression, the emergency room
21 doctor put down under diagnosis, right rib fracture, cervical
22 spine sprain.
23      Is that correct, Doctor?
24 A. Yes.
25 Q. I've looked over the report and I see then that at

Page 41

1 the day of the accident this patient in the emergency room
2 only complained of his right ribs and of a neck sprain, and
3 that being the diagnosis.
4     Is that correct, Doctor?
5 A. Yes.
6 Q. Go to the next page, Doctor, emergency room physician
7 record.
8 A. Yes.
9 Q. And under location of pain/injuries, the circles were
10 made only to the chest and the abdomen; is that correct?
11 A. Yes.
12 Q. And under the neck, do you see that to the right,
13 according to the doctors in the emergency room they checked
14 off non-tender painless range of motion. Isn't that true?
15 A. Yes.
16 Q. What does that mean when an emergency room doctor
17 puts down non-tender painless range of motion?
18     What does that mean, Doctor?
19 A. That means that the examination of the neck had
20 normal ranges of motion and was not painful.
21 Q. In other words, he was able to move his neck to the
22 right, to the left, back and forward, and it was not tender?
23 A. Yes.
24 Q. Is that true, Doctor?
25 A. Yes.

Page 42

1 Q. If we go to the next page, three, under back, does it
2 indicate that under the back and under extremities that based
3 upon examination in the emergency room everything was normal
4 with regard to the extremities in the back?
5 A. Seems to be.
6 Q. All right. If we go to the next page, cervical spine
7 x-ray, there was no evidence of fracture or dislocation of the
8 neck.
9     Is that true, Doctor?
10 A. Correct.
11 Q. And that would be something normal to do, Doctor, in
12 your opinion, that is the emergency room doctor to say,
13 patient, let's have your neck x-rayed to see whether there's
14 any fractures because of the sprain to your neck?
15 A. Yes.
16 Q. Fortunately, he had no fractures of the neck,
17 correct?
18 A. Yes.
19 Q. If we go to the next page, the right ribs were also
20 x-rayed and the next page indicates the right ribs that there
21 was a minimally displaced fracture involving the right seventh
22 rib.
23     Is that correct?
24 A. Yes.
25 Q. And the next page is chest and there was nothing

Page 43

1 abnormal; it was a negative film, correct?
2 A. Yes.
3 Q. We're going to mark that set, Doctor, as Exhibit No.
4 4 to your deposition. Let's just put that on the front.
5     (Exhibit No. 4 marked.)
6 Q. (By Mr. Rodriguez:) Now, Doctor, is this the first
7 time you've seen the emergency room records for this patient?
8 A. Yes.
9 Q. Let's now review, Doctor, if we can, the records from
10 Doctor Cano's office.
11     And Dr. Cano saw the patient on the day after
12 the accident, January 17, 2003, and I have shown you a diagram
13 that the patient was presented with apparently by Dr. Cano in
14 his clinic.
15     And up on the top the document states mark these
16 drawings according to where you hurt. If the back of your
17 neck hurts mark the drawing on the back of the neck, etcetera.
18     Doctor, where does it indicate that this patient
19 had pain on January 17, 2003?
20 A. It is not marked clearly, although on the right rib
21 cage I would say that there was an ache there marked.
22 Q. Did mark an aching area in the right rib area. Do
23 you see anything on the forehead, the right --
24 A. Yes, also --
25 Q. Okay.

Page 44

1 A. -- the forehead.
2 Q. Now, do you see anything indicate -- indicative of
3 pain, discomfort, anything, in the back or the neck according
4 to this diagram?
5 A. No.
6 Q. Go to the next page, please, Doctor. And have you
7 seen these records -- this type of record before?
8 A. No, I have not.
9 Q. Okay. I will represent to you that these are
10 physical therapy type records that were provided by the Cano
11 Clinic, and according -- if you will review on the top of
12 January 22nd, 2003, where was the pain that this patient was
13 talking about to the physical therapist?
14 A. Pain level at the rib cage has decreased slightly
15 with therapy. This is in regards to 1/23/03.
16 Q. All right. And so he talked about the rib having
17 pain on January 22, 2003. On January 23, 2003, the rib cage
18 was also indicated as being painful; is that correct, Doctor?
19 A. Yes.
20 Q. And on January 24, 2003, it states here patient went
21 back to work yesterday and -- something -- no med due to
22 driving. He took no meds because of -- due to driving.
23     Is that correct?
24 A. Yes.
25 Q. And under that it says patient has strong pain and

Page 45

1 discomfort to the ribs due to being back at work. He is not
2 able to take medication.
3     Doctor, do you see anything in these records in
4 January, 2003, that this patient was complaining of pain to
5 the neck or to the low back?
6 A. No.
7 Q. Let's go to the next page, January 17, 2003.
8     He complains of right side of the abdomen area,
9 pain to the forehead and -- do you see any indication of pain
10 in the low back or the neck on January 17th, 2003?
11 A. It's not marked.
12 Q. Okay. And do you see -- when the report says on
13 there no LOC, what does that mean, Doctor?
14 A. That means no loss of consciousness.
15 Q. He did not pass out according to this report at the
16 time of the accident?
17 A. Apparently not.
18 Q. Under diagnosis in the middle of the report there,
19 the diagnosis was fracture of the ribs, right chest, frontal
20 skull contusion.
21     That was the only diagnosis at that time; is
22 that correct, Doctor?
23 A. Yes.
24 Q. If we go to the next page, again, on January -- on
25 February 7, 2003, on -- I'm sorry.

Page 46

1 A. Okay.
2 Q. Right here, Doctor. February 7, 2003, follow-up to
3 rib crack -- rib fracture, states he is all right except for
4 nighttime when he lies on the right side.
5     Again under --
6     Did I read that correctly, Doctor?
7 A. Yes.
8 Q. And the indications here again are of a diagnosis
9 involving the ribs, nothing about the low back or the neck.
10     Would you agree, Doctor?
11 A. Yes.
12 Q. Okay. I think if we go to this page, February 3,
13 2003, on the top there, Doctor, does the patient indicate that
14 he reinjured his rib cage somehow?
15 A. Yes.
16 Q. And how did he injure -- reinjure his rib cage?
17 A. Says pain level increased to rib due to falling again
18 at work.
19 Q. All right. If we go down to the last entry on
20 February 7, 2003, on that page, Doctor, does it indicate that
21 the patient is feeling better as of February the seventh,
22 2003?
23 A. Yes.
24 Q. Which -- I'm just going to have you go quickly,
25 Doctor, the other pages.

Page 47

1     On February 28th here, 2003, and if I read this
2 incorrectly please tell me, Doctor.
3     The -- under history the -- Dr. Cano wrote on
4 here follow-up to a rib fracture, states he's feeling better
5 but every night he has a sharp pain to that area. Complains
6 of shoulder pain.
7     Now, before this February 28, 2003, have you
8 seen any record that I have given you, Doctor, where he has
9 complained of shoulder pain?
10 A. No.
11 Q. So this is really the first time, February 28, 2003,
12 he now adds to the rib complaints of pain, the shoulder.
13     Would that be correct, Doctor?
14 A. Yes.
15 Q. If you go to the next page, April 21, 2003, on the
16 top, follow-up to fractured rib right side. Pain is one to
17 two on the scale, presumably one out of ten, Doctor, two out
18 of ten, complaining more about the right shoulder soreness?
19 A. Yes.
20 Q. All right. And on the bottom do you -- on the left
21 side, Doctor, does it indicate that an examination was done of
22 the right shoulder and that there was full range of motion of
23 the right shoulder?
24 A. Yes.
25 Q. Does it also indicate that Dr. Cano fund no numbness

Page 48

1 or tingling with tenderness?
2     Did I read that correctly?
3 A. Yes.
4 Q. And am I -- I may not be reading this correctly,
5 Doctor, on that last part where it says it may be without
6 tenderness or with tenderness.
7     Do you see that there on the very bottom on the
8 left side?
9 A. Yes. W usually is with tenderness.
10 Q. With tenderness?
11 A. Right.
12 Q. Okay. But at that time thankfully he had no numbness
13 or tingling, based upon that right shoulder being examined,
14 correct?
15 A. Correct.
16 Q. And those are good findings, are they not?
17 A. Yes.
18 Q. I mean those are normal findings to have in a person
19 that is complaining of pain on the right shoulder, that they
20 have no numbness or tingling which would make the case more
21 complicated.
22     Would you agree, Doctor?
23 A. Yes.
24 Q. The final page, Doctor, is April 22, 2003. That one,
25 Doctor.

Page 49

1    And according to this report, under diagnosis,
2 the doctor wrote and entered on here, right chest resolved,
3 right shoulder resolved, able to perform all tests required
4 for impairment rating at one hundred percent or better. Zero
5 percent impairment rating. Reached MMI today, April 22, 2003.
6    Did I read all that correctly, Doctor?
7    A. Yes.
8    Q. What does it mean that he had zero percent impairment
9 rating?
10    A. That means that under certain guidances of the guides
11 of the American Medical Association, Dr. Cano saw that he had
12 no impairment.
13    Q. But if we talk about impairment, and if Dr. Cano
14 found in April, 2003, that he had no impairment, physically
15 what does that mean about the patient, his ability to
16 function?
17    A. It means that his injury rated by the American
18 Medical Association was a zero.
19    Q. Okay. In other words, he's not impaired to any
20 percentage that this medical doctor found based upon his
21 examination and treatment of this patient.
22    Would you agree?
23    A. Yes.
24    Q. All right. And under the plan Dr. Cano wrote on this
25 report, resolved and released.

Page 50

1    A. Yes.
2    Q. All right. Now, Doctor, I will represent to you that
3 that -- as that record indicates, that date was April, 2003.
4    Do you know when this patient was seen by
5 Dr. Gill for the first time?
6    A. I don't know.
7    Q. I will represent to you, Doctor, that the first
8 report I have from Dr. Gill is August 20, 2003. And if that's
9 correct then, and if Dr. Cano released him April, 2003, we
10 have a gap in treatment of about three, almost four months,
11 until Dr. Gill sees Mr. Rodriguez.
12    Would you agree?
13    A. Yes.
14    Q. All right. Are you aware of any treatment between
15 Dr. Cano and Dr. Gill by this patient?
16    A. No.
17    Q. Now, you have testified in this deposition to this
18 patient having complaints of pain that he presented to you
19 about his neck, his low back, that is extended into the arms
20 and into the legs.
21    Is that true, Doctor?
22    A. Yes.
23    Q. Now, did you see in any report that I presented to
24 you up until April, 2003, that this patient complained of
25 similar symptoms to Dr. Cano or the emergency room doctors?

Page 51

1    A. No.
2    Q. Would you have expected, by April 2003, three months
3 after this car accident, that by that point in time this
4 patient should have demonstrated symptoms that he presented to
5 you later in November 2003?
6    A. Most likely, yes.
7    Q. And those complaints would be the radiculopathy in
8 the legs and in the arms, specifically, isn't that true,
9 Doctor?
10    A. Yes.
11    Q. That if he's in a car accident in January 16, 2003,
12 and if the trauma resulted in ultimately numbness, tingling,
13 severe pain in the arms and in the legs, you would have
14 expected that to have occurred by April, 2003, would you not?
15    A. Yes.
16    Q. All right. Now, I understand, Doctor, you have not
17 seen these records before, and when you now know about this
18 treatment having occurred and the symptomology that this
19 patient presented before he saw you, Doctor, would it change
20 your opinion about whether the car accident caused everything
21 that he presented to you, or perhaps some other explanation
22 for the pain that he has?
23    MR. CRANE: Object to the form.
24    A. At this point I don't have another explanation of the
25 origin of his pain. I do know that by history he described

Page 52

1 his pain as coming on in a slow fashion after the accident.
2 But essentially I don't know of any other intervening factors.
3    Q. (By Mr. Rodriguez:) Okay. I will show you something
4 from Dr. Bennos, from page four of his records under patient
5 notes. Is there indication in there the trauma or the
6 accident that Mr. Rodriguez had and what he told Dr. Bennos
7 about his history?
8    A. It says back pain, bilateral leg pain, patient was a
9 head-on motor vehicle accident five months ago. No history of
10 back surgery.
11    Q. Now we know, Doctor, do we not, that he went to see
12 Dr. Bennos in October 2003, correct?
13    A. Yes.
14    Q. So if he, in October 2003, says I was in a head-on
15 collision five months ago, that would be what date, then,
16 Doctor?
17    A. It would have been on or about May, 2003.
18    Q. May. Now, does that coincide with the date of the
19 accident that we're here about?
20    A. No.
21    Q. All right. Are you aware of Mr. Rodriguez having
22 maybe another accident of some kind that may have led to the
23 symptoms he presents to you?
24    A. No.
25    Q. All right. Have you seen in patients slips and falls

Page 53

1 that can cause the conditions of the low back or the neck as
2 we found in Mr. Rodriguez?
3   A. Yes.
4   Q. Okay. Now, we did go over a physical therapy entry,
5 Doctor, where he says that he had slipped and fallen at work
6 and had reinjured his rib cage. Do you remember that?
7   A. Yes.
8   Q. And -- I don't know anything more than about that
9 description of the trauma. Did he tell you that he had
10 slipped and fallen at work?
11   A. No, he did not.
12   Q. Let me just go over a few items on your testimony,
13 Doctor.
14         The straight leg raise was seventy percent in
15 your examinations?
16   A. Yes.
17   Q. What is normal straight leg?
18   A. Normal is zero. That means when the leg is up to
19 ninety degrees in a sitting or laying down position, that is
20 zero. That means that as the leg goes up we go from zero up
21 to ninety, and if we hit ninety degrees that is negative,
22 that's normal. He had seventy. So almost as he was getting
23 to ninety degrees he had pain.
24   Q. Okay. He was close to ninety degrees when you're at
25 seventy degrees?

Page 54

1   A. Yes.
2   Q. Would you agree?
3   A. Yes.
4   Q. I mean this is not a severe result in the straight
5 leg raise indicative of some kind of severe condition in the
6 low back, is it?
7         MR. CRANE: Objection; form.
8   A. It is an abnormal sign of leg raising indicative of
9 some degree of irritation of nerve roots, although not as a
10 very striking examination.
11   Q. (By Mr. Rodriguez:) Okay. And you just raised a
12 point, Doctor. I did not see in any of the three MRIs that
13 were taken of this patient that there was any impingement upon
14 a nerve root.
15         Would you agree?
16   A. The only one we saw was at L3 where Dr. Bennos
17 describes edema and thirty percent impingement at the
18 foramina.
19         The rest is ascribed as usual, as a posterior
20 bulge of the discs.
21   Q. I'm reading that, Doctor, where it says on L4/L5
22 there was a broad-based disc protrusion present indicative of
23 disc edema encroaching upon that exit.
24         I understand all that, Doctor. But I don't see
25 in here where the radiologist said it was actually impinging

Page 55

1 upon the nerve root.
2         I mean -- do you see that in there, Doctor?
3   A. No, I don't.
4   Q. All right. And if you could raise that model, what
5 we're saying is that none of the MR -- the yellow part is the
6 nerve root, is it not?
7   A. Yes.
8   Q. All right. And if you have that nerve root being
9 impinged upon or pinched in any way or touched in any way,
10 that can result in discomfort or pain in the patient, can it
11 not?
12   A. Yes.
13   Q. And in this case what we're saying is that the MRIs
14 that Dr. Gill recommended and were undertaken for this
15 patient, none of the MRI films show an actual pinching or
16 touching of a nerve root.
17         Would you agree?
18   A. It does not, yes.
19   Q. And so also in terms of the bulging being broad
20 based, these protrusions being broad based, I don't see
21 anywhere where any of the reports indicated that the
22 protrusion was focal in nature but rather broad based in
23 nature.
24         Would you agree?
25   A. Yes.

Page 56

1   Q. I have spoken to other radiologists and they tell me
2 that if the protrusion is described as being broad based,
3 they're saying that that was slow in development and not
4 something that occurred more recently or the result of any
5 trauma that was acute.
6         Would you agree, Doctor?
7   A. I would agree.
8   Q. All right. And so if any -- so the radiologists
9 indicating that all the protrusions being broad based, that
10 takes time for the protrusion to have developed to the point
11 that we see on the MRI films.
12         Would you agree, Doctor?
13   A. Usually, yes.
14   Q. It would not be just weeks or months but years.
15         Would you agree?
16   A. I wouldn't know about years, but it does take time to
17 occur.
18   Q. Okay. Well, would it have been within the ten
19 months, nine months?
20   A. It's a true possibility.
21   Q. Okay. I know it's possible, but within a reasonable
22 degree of medical probability can you, Doctor, say that the
23 broad based disc protrusions that this patient had are or were
24 created in this car accident?
25   A. Within reasonable medical probability it is not

Page 57

1 possible to tie it to that.
2   Q. All right. That edema, how long does that take to
3 develop?
4   A. It's fast. It may be hours, may be days. And edema
5 can stay there for some time.
6   Q. It could stay there for nine months?
7   A. It's possible, yes.
8   Q. You have not rendered an opinion that this patient
9 needs surgery; isn't that true?
10  A. Correct.
11       MR. RODRIGUEZ: Doctor, I believe that's all I
12 have. Thank you, sir.
13            FURTHER EXAMINATION
14 BY MR. CRANE:
15  Q. Doctor, I have a few more follow-up questions if you
16 don't mind.
17       You were asked certain questions about the
18 emergency room visit. When a patient goes to an emergency
19 room would I be correct in saying that what the emergency room
20 personnel and doctors are looking for are immediate and acute
21 problems?
22  A. Yes.
23  Q. If a person has a broken bone they want to find that
24 and set it?
25  A. Yes.

Page 58

1   Q. If a person is bleeding they want to stop the
2 bleeding?
3   A. Yes.
4   Q. But they do not do the diagnostic tests normally that
5 a doctor such as you would do when a person comes to his
6 office; is that correct?
7   A. Yes.
8   Q. Is it also true that a broken rib is a very, very
9 painful physical condition?
10  A. Yes, it is.
11  Q. And is it also true that a person, from your
12 experience, will normally concentrate on the most painful
13 physical condition he has at the time?
14  A. Yes.
15  Q. Does a broken or fractured rib take a considerable
16 amount of time to heal?
17  A. Yes.
18  Q. Does it remain painful throughout that healing
19 process?
20  A. Yes.
21  Q. And would it be unusual, in your opinion, based on
22 the many patients you have seen and your medical training for
23 a person such as Mr. Rodriguez to be concentrating on the most
24 painful aspect of his injury rather than other things that are
25 coming up slowly such as neck and back pain?

Page 59

1   A. It would not be unusual.
2   Q. And do you feel that would be a reasonable
3 explanation for Mr. Rodriguez not mentioning neck or pack back
4 pain at the emergency room or even to Dr. Cano?
5       MR. RODRIGUEZ: objection; form.
6   A. Yes.
7   Q. (By Mr. Crane:) Additionally, Doctor, you told
8 opposing counsel that protrusions are really normally an
9 accumulation of events that can remain asymptomatic, in other
10 words not bother a fellow until some final event occurs and
11 causes them to become symptomatic; is that right?
12  A. Yes.
13  Q. So would it be fair to say, based on reasonable
14 medical probability, that Mr. Rodriguez may have had some
15 preexisting conditions that did not cause him any problems
16 until this wreck occurred?
17       MR. RODRIGUEZ: objection; form.
18  A. Yes.
19  Q. (By Mr. Crane:) And after the wreck occurred or
20 after that trauma occurred, that is what caused these
21 preexisting conditions to become symptomatic and start
22 bothering him?
23  A. Yes.
24  Q. You were asked some questions about osteoarthritis.
25 Can arthritic problems be aggravated by trauma?

Page 60

1   A. Yes.
2   Q. Can it cause the arthritis to advance at a more rapid
3 pace?
4   A. Not likely.
5   Q. Can it cause it to become symptomatic where before it
6 was not symptomatic?
7   A. Yes.
8   Q. You were asked something about the broad based discs,
9 the fact that they weren't impinging on a nerve and possibly
10 had been there for some time. Even though those discs were
11 broad based, even if they weren't impinging on nerves, you
12 also told us that trauma such as this accident can cause small
13 breaks in the nucleus to occur, did you not?
14  A. Yes.
15  Q. And you said that allows the liquid to begin escaping
16 from those discs?
17  A. Yes.
18  Q. And that of and by itself can cause pain, back pain,
19 can radiate into the legs; is that correct?
20  A. Yes.
21  Q. Okay. So even though there -- and I'm not saying
22 there is an impingement, I don't know exactly what the
23 radiologist meant by encroachment, to me that would be
24 something moving in there, but even if there was no
25 impingement, you can still have the very pain that

Page 61

1  Mr. Rodriguez complains about?
2  A.  Yes.
3  Q.  And it would be the result of the accident?
4  A.  Yes.
5      MR. CRANE  I think those are all the questions
6  I have. Thank you, Doctor.
7      THE WITNESS  Thank you.
8      MR. RODRIGUEZ  I have nothing further except I
9  would like, just for the record, to go ahead and mark Exhibit
10 5, the other set of records from Doctor Cano's office.
11     MR. CRANE  You don't mind I need to mark this,
12 too.
       (Exhibits Nos. 5 through 10 marked.)
13     (Signature waived.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 62

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ROGELIO RODRIGUEZ and    )(
ELIZABETH RODRIGUEZ      )(
                         )(
       vs.               )( CIVIL ACTION NO B-04-137
                         )(
JAMES ARTHUR LARSON      )(

REPORTER'S CERTIFICATE

I, THURMAN J MOODY, Certified Shorthand Reporter, certify that the witness, JORGE TIJMES, M D , was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on June 21, 2005; that the deposition was reported by me in Stenographic shorthand and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this __ day of July, 2005.

THURMAN J MOODY, CSR NO 2861
Expiration Date: 12/31/05

WILSON REPORTING SERVICES
Firm Registration No. ____
Post Office Box 532003
Harlingen, Texas 78553
(956) 412-5700