IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ROGELIO RODRIGUEZ and ELIZABETH RODRIGUEZ | )( )( )( |
| Plaintiffs | )( )( |
| vs. | )(  CIVIL ACTION NO. B-04-137 )( |
| JAMES ARTHUR LARSON | )( )( |
| Defendant | )( |

---

ORAL AND VIDEOTAPED DEPOSITION OF
JORGE TIJMES, M.D.
JUNE 21, 2005

---

ORAL AND VIDEOTAPED DEPOSITION OF JORGE TIJMES, M.D., produced as a witness duly sworn by me at the instance of the plaintiffs Rogelio Rodriguez and Elizabeth Rodriguez, taken in the above-styled and numbered cause on June 21, 2005, before THURMAN J. MOODY, Certified Shorthand Reporter No. 2861 in and for the state of Texas, at the offices of the witness, 320 North McColl Road, Suite A, McAllen, Texas, pursuant to the Federal Rules of Civil Procedure.



WILSON REPORTING SERVICES
P. O. BOX 532003, HARLINGEN, TEXAS 78553
[956] 412-5700        [956] 412-5771-FAX

18:59  1   back, and we're talking about the lumbar, so just to depict
18:59  2   that the nerves are bigger here, the nerves are then touched
18:59  3   at each level by the abnormal disc when this disc is in a
19:00  4   abnormal position, which is a disc C3/C4 that is having a
19:00  5   protrusion.
19:00  6        Q.   Okay. And then the report goes on and basically says
19:00  7   that there were disc protrusions of various sizes on C3 dash 4
19:00  8   through C6 dash 7.
19:00  9             What exactly is Dr. Berger saying there?
19:00  10       A.   He is meaning to say that all the discs were
19:00  11  abnormally big, having a bulge in excess of what he would
19:00  12  consider a normal disc description.
19:00  13       Q.   And, Doctor, I'm going to ask you some questions that
19:00  14  will require you to rely on your training as a doctor and your
19:00  15  education in the medical field.
19:00  16            When I ask you those type of questions will you
19:00  17  base your answers on reasonable medical probability?
19:01  18       A.   Yes, I would.
19:01  19       Q.   Can you tell me if disc protrusions, such as those
19:01  20  seen in Mr. Rodriguez' neck in the MRI, if protrusions such as
19:01  21  that can be the result of traumas such as the automobile
19:01  22  accident which Mr. Rodriguez was involved on January the
19:01  23  sixteenth of 2003?
19:01  24            MR. RODRIGUEZ:  Objection; form.
19:01  25       A.   Yes, they can.

19:01  1    Q.   (By Mr. Crane:)   And can you tell us whether or not
19:01  2    you have an opinion as to whether Mr. Rodriguez' injuries or
19:01  3    protrusions we're talking about were the cause of that
19:01  4    incident?
19:01  5              MR. RODRIGUEZ:   Objection; form.
19:01  6    A.   Within reasonable medical probability it's my opinion
19:01  7    that bulges that Mr. Rodriguez has on these MRIs were trauma
19:01  8    related to the 1/16/2003 injury.
19:01  9    Q.   (By Mr. Crane:)   Okay.   And Dr. Berger goes on to say
19:01 10    that there is subtotal opacification of the left maxillary
19:02 11    antrum and moderate mucosal thickening of the base of the
19:02 12    right maxillary antrum.
19:02 13              What is he telling us there?
19:02 14    A.   Essentially the MRI does not stop at the first
19:02 15    cervical bone; it goes on to depict the maxillary sinus and
19:02 16    this means that he has a chronic sinusitis there.
19:02 17    Q.   Okay.   Now, would that be related in any way to the
19:02 18    accident?
19:02 19    A.   No.
19:02 20    Q.   Okay.   This is just another finding that was seen
19:02 21    when the study was done?
19:02 22    A.   Yes.
19:02 23    Q.   All right.   In addition to the cervical MRI that you
19:02 24    have just discussed with us, did you do any additional
19:02 25    diagnostic testing?

19:11  1    Q.  So would it be fair to say that we could expect him
19:11  2  to continue to suffer pain and -- as he continues through
19:11  3  life?
19:11  4    A.  Within reasonable medical probability, yes.
19:11  5    Q.  Okay. And would you put restrictions on someone who
19:12  6  has the physical findings that you have found in
19:12  7  Mr. Rodriguez?
19:12  8    A.  That is related to the difficulties of activities of
19:12  9  daily living. I would put restrictions on somebody suffering
19:12  10  from this type of pain after a functional capacity evaluation
19:12  11  has been performed.
19:12  12        And, in my opinion, if he has had this type of
19:12  13  pain pattern without any resolution, I would dare to say that
19:12  14  he would be on the medium type of job description on the PDC
19:12  15  level.
19:12  16    Q.  What -- sorry, I don't understand exactly what you
19:12  17  meant by that. The medium range level. I lost you there.
19:12  18    A.  The classification of job, of physical job, pushing,
19:13  19  pulling, carrying, sitting and standing would give us either a
19:13  20  light-duty, medium-duty or full-duty without restriction.
19:13  21        I'm saying that with a functional capacity
19:13  22  evaluation, coupled with these symptoms that do not get
19:13  23  corrected in time by either medications or pain clinic, pain
19:13  24  injections, then I would place a medium work description and
19:13  25  restriction on his job.

```
19:17  1    the lumbar.
19:17  2              Once again, you're familiar with the fair and
19:17  3    reasonable charges for those services?
19:18  4       A.   Yes, I am.
19:18  5       Q.   And are those fair and reasonable charges for the MRI
19:18  6    of the lumbar spine?
19:18  7       A.   Yes, in by opinion they are.
19:18  8       Q.   Okay.  And do you feel that that MRI was necessitated
19:18  9    by the accident of 1/16/2003?
19:18 10       A.   In my opinion it was, yes.
19:18 11       Q.   And finally, Doctor, I'd like to show you the bill
19:18 12    received from Dr. Bennos for his reading of the lumbar MRI in
19:18 13    the amount of three hundred dollars.
19:18 14              Are you familiar with the charges of the various
19:18 15    doctors who read MRIs?
19:18 16       A.   Yes, I am.
19:18 17       Q.   And is three hundred dollars a fair and reasonable
19:18 18    charge for the services performed by Dr. Bennos?
19:18 19       A.   Yes, in by opinion it is.
19:18 20       Q.   And, once again, that was necessitated by the
19:18 21    1/16/2003 accident?
19:18 22       A.   Yes, in my opinion it was.
19:18 23       Q.   Thank you, Doctor.
19:18 24              Doctor, do you feel that, once again, based on
19:19 25    reasonable medical probability, that Rogelio Rodriguez will
```

19:19  1   require additional medical treatment in the future?
19:19  2        A.   Within reasonable medical probability I would say
19:19  3   that if the pain persists and he is still symptomatic he will
19:19  4   require further treatment.
19:19  5        Q.   And what type of treatment, future medical treatment,
19:19  6   do you believe that he will require?
19:19  7        A.   The main treatment would be the pain medications and
19:19  8   muscle relaxers if this pain continues.  The other factor we
19:19  9   have to consider is diagnostic testing.
19:19 10        Q.   What type of diagnostic testing?
19:19 11        A.   At this point we have a young man that complains
19:19 12   about neck pain, some arm discomfort, low back pain, and the
19:19 13   testing that would be necessary to improve his treatment would
19:19 14   be a neurological examination, a nerve conduction study, EMG
19:20 15   called or ENT, a nerve velocity study which is an NCV.
19:20 16        Q.   What would the cost of that type of diagnostic
19:20 17   testing be?
19:20 18        A.   The usual customary cost for that would be seven
19:20 19   hundred dollars for a neurological exam and EMG and NCV.
19:20 20        Q.   Also you talk about pain medication and relaxants.
19:20 21   That will require Mr. Rodriguez seeing a doctor so he can
19:20 22   prescribe that medication, correct?
19:20 23        A.   Yes.
19:20 24        Q.   What would a doctor's visit normally cost for someone
19:20 25   such as Mr. Rodriguez?

Q. I have spoken to other radiologists and they tell me that if the protrusion is described as being broad based, they're saying that that was slow in development and not something that occurred more recently or the result of any trauma that was acute.

Would you agree, Doctor?

A. I would agree.

Q. All right. And so if any -- so the radiologists indicating that all the protrusions being broad based, that takes time for the protrusion to have developed to the point that we see on the MRI films.

Would you agree, Doctor?

A. Usually, yes.

Q. It would not be just weeks or months but years.

Would you agree?

A. I wouldn't know about years, but it does take time to occur.

Q. Okay. Well, would it have been within the ten months, nine months?

A. It's a true possibility.

Q. Okay. I know it's possible, but within a reasonable degree of medical probability can you, Doctor, say that the broad based disc protrusions that this patient had are or were created in this car accident?

A. Within reasonable medical probability it is not

19:57  1   possible to tie it to that.
19:58  2       Q.   All right.  That edema, how long does that take to
19:58  3   develop?
19:58  4       A.   It's fast.  It may be hours, may be days.  And edema
19:58  5   can stay there for some time.
19:58  6       Q.   It could stay there for nine months?
19:58  7       A.   It's possible, yes.
19:58  8       Q.   You have not rendered an opinion that this patient
19:58  9   needs surgery; isn't that true?
19:58  10      A.   Correct.
19:58  11           MR. RODRIGUEZ:  Doctor, I believe that's all I
19:58  12  have.  Thank you, sir.
19:58  13                      FURTHER EXAMINATION
19:58  14  BY MR. CRANE:
19:58  15      Q.   Doctor, I have a few more follow-up questions if you
19:58  16  don't mind.
19:58  17           You were asked certain questions about the
19:58  18  emergency room visit.  When a patient goes to an emergency
19:58  19  room would I be correct in saying that what the emergency room
19:59  20  personnel and doctors are looking for are immediate and acute
19:59  21  problems?
19:59  22      A.   Yes.
19:59  23      Q.   If a person has a broken bone they want to find that
19:59  24  and set it?
19:59  25      A.   Yes.