1    a spinal cord in the center and the spinal cord is

2    surrounded by three fine layers.  Fine layers, it means to

3    say very thin even they're less than paper thin, okay?

4    And that's called the thecal sac.  The spinal cord is

5    surrounded by these layers with the fluid inside these

6    layers.

7         Q.   So what is the significance, if any, on the

8    impingement on the thecal sac?

9         A.   Impingement on the thecal sac is the material is

10   pressing on the thecal sac.  That's the layers of the

11   spine, so that it means it started compressing, not the

12   spine itself, but the layers of the spine.

13        Q.   Is that going to cause pain?

14        A.   It can cause pain.

15        Q.   How about the fact that there's an element of

16   central stenosis.  What does that mean?

17        A.   Central stenosis means -- stenosis only means

18   lateral.  There's a tube and when it narrows it's called

19   stenosis.  There's a spinal canal where the spinal cord

20   goes through and it's like a rope, okay?  And then when

21   the disk or the disk protrusion is compressing then it

22   starts narrowing the canal of the spine, to which the

23   spinal cord is going through.

24        Q.   Okay.  Is this stenosis something that you would

25   relate to the automobile accident?

Page 40

1        A.    I think the stenosis is due to the tear of the

2   disk that's causing the stenosis.   It's causing narrowing

3   of the spine.   Stenosis only means narrowing of the spine.

4        Q.    So if it is a result of the tear, you believe the

5   tear is a proximate cause of the automobile accident?

6        A.    Well, with medical probability, yes, in this

7   particular case.

8        Q.    So then the stenosis that you're seeing occur is

9   also related to that; would that be correct?

10       A.    That would be correct.   I would say it is more

11  related -- the tear is causing the stenosis, okay.   The

12  disk is causing the stenosis of the spine.

13       Q.    And then in this most recent MRI, it says at

14  L4-L5, there is a 4 to 4.5 millimeter central disk

15  protrusion to more likely early herniation with HIZ.   What

16  does HIZ mean?

17       A.    I don't know.   Radiologists use this term.

18       Q.    Along the posterior left annulus indicative of a

19  small posterior left annular tear.

20       A.    That means that there is a tear of the ring in

21  the -- of the -- I can show on that same drawing or

22  something like that like the one we had before?

23       Q.    Sure, yeah.   You want to show them this?   I need

24  at least one more arm.   Do you want to come up here and --

25                  THE WITNESS:   May I, your Honor?

1          THE COURT:  Yes, please.

2          MR. CRANE:  Is it okay, Judge?

3          THE COURT:  Yes.

4      A.   This is of the spine, but it's exactly the same

5  for the lower parts.  That's called the lumbar, so it's

6  not for confusion, okay?  This is patient's left side if

7  you're looking from back, okay?  Let's assume this is the

8  lumbar spine and this over here and lumbar means the lower

9  back and the disk vertebrae look a little differently, so

10  it is pressing on the left side of the patient.

11     Q.   This protrusion is coming out instead of over

12  there, it's coming out now over here?

13     A.   Yes, it depends where you're looking from, okay?

14  If you're looking like this here over here (indicating),

15  the protrusion is coming out on the left side of the

16  patient and it is pressing, starting to press on one of

17  the nerves.

18     Q.   Okay.

19     A.   It's the L4, whatever nerve you're talking about.

20     Q.   And, Doctor, I'm sure you noted when you compared

21  L4-L5 this time, the initial reading of the L4-L5 disk has

22  changed; has it not?

23     A.   That is correct.

24     Q.   And how has it changed because now you have a

25  protrusion where one was not before?

1       A.    Right.

2       Q.    Okay.

3       A.    May I sit down?

4       Q.    Yes, please do.  And now the doctor is saying

5   there's also an impression on the thecal sac and there is

6   an element of canal stenosis, correct?

7       A.    Correct.  That's for --

8       Q.    And at L --

9       A.    L3-L4.

10      Q.    Yeah.

11      A.    I thought we were talking about L4-L5.

12      Q.    I might have gotten -- no, no, that's L4-L5, I

13  believe.

14      A.    Yeah, L4-L5.

15      Q.    Okay.  Now going onto L5-S1, which is the very

16  bottom one.  There's a three millimeter central bulge of

17  the disk there, okay?  So what can you tell when you

18  compare these two MRIs?  What can you tell the jury has

19  been happening to Rogelio?

20      A.    Well, I could tell the jury that this patient's

21  injuries are related to this accident and particularly his

22  lower back, that's his lumbar spine, that he has had his

23  injury is -- has become more definitive, means that it is

24  more prominent after period of time.  It doesn't mean to

25  say that he did not have this injury.  This is not one

Page 43

1    injury that can suddenly it's injury and it's progression

2    of the same injury.

3        Q.   Doctor, are you aware that Roy came to see you

4    sometime I think it was in the early part of October right

5    before that last MRI?

6        A.   Yes.

7        Q.   That he had an injury at work?

8        A.   Right.

9        Q.   Do you recall that?

10       A.   Uh-huh.

11       Q.   Do you recall that?

12       A.   I recall it, yes.

13       Q.   Do you recall how his injury at work occurred?

14       A.   If I'm -- actually, when I came over here he came

15   to see me, he -- I was not too impressed with the injury,

16   okay.  And because he said he had strained his back and so

17   we didn't pay that much attention to him.  We just

18   continued treating for his previous injury.

19       Q.   Okay.

20       A.   Yeah.

21       Q.   Opposing counsel has made the argument to the

22   jury that Rogelio's disk herniation is not the result of

23   this horrendous wreck he was in, but rather as a result of

24   picking a pipe up at work.  Is there any way based on the

25   medical evidence that you can tell us why that argument is

1    incorrect?

2        A.    In all medical probability almost everything we

3    have discussed this afternoon can be related to his

4    accident because his accident is extensive with the type

5    of injuries.  He had fractured ribs, head injury, he broke

6    the steering wheel I gather or steering wheel of his

7    truck, so this is more likely, all medical probability

8    more likely due to that accident than lifting a pipe.

9        Q.    Well, let me ask you this Doctor:  You've noted

10   that in this last MRI that they talked about desiccation

11   of some of these disks?

12       A.    Right.

13       Q.    And they've talked about protrusions have

14   occurred?

15       A.    Yeah.

16       Q.    Would desiccation -- if he had injured his disks

17   by lifting that pipe a couple weeks before this last MRI

18   was taken --

19       A.    Right.

20       Q.    -- would desiccation have shown up?

21       A.    I should like --

22       Q.    Pardon?

23       A.    I think he had desiccation before in the previous

24   MRI, the one that we discussed.

25       Q.    He did at different levels?

```
 1        A.    Yes.

 2        Q.    If he had injured his back, though, in September

 3   and then came to you and had this MRI on the 4th, would

 4   the MRI of the 4th show desiccation that quickly:

 5   10/4/04?

 6        A.    I think it shows more than that.  He has disk

 7   protrusion and also impression on his thecal sac of his

 8   spine and also of his nerve on the left side.

 9        Q.    I'm sorry.  I missed that, Doctor.

10        A.    Would you state your question again.  I'm sorry.

11   My fault.

12        Q.    Okay.  What I'm trying to figure out is how you

13   can be, per se, based on reasonable medical probability

14   that the lifting of the pipe is not what caused the disk

15   herniation that he's showing up with in the MRI of October

16   of '04?

17        A.    I think common sense would tell me the extent of

18   the injury and all the previous MRI indicative of injuries

19   to the disk and this is just a continuation of that injury

20   and there may be some slight aggravating factor, but

21   definitively I can say it is not likely to cause all the

22   injuries to the spine, this lifting of the pipe.

23        Q.    Okay.  Do you feel, Doctor, that because of the

24   way Mr. Rodriguez's injuries have progressed that that

25   shows when the injury occurred?
```

1      A.    I think the injury occurred at the time of his

2  accident and it just -- what you call -- we were able to

3  make the diagnosis at different stages in time, but the

4  injuries occurred from his accident.

5      Q.    If one someone had herniated a disk, would you

6  expect that to get worse as time goes on?

7      A.    Absolutely.  It's not a stationary thing that you

8  get injury to the disk and it stops there, okay?  Even --

9  it has to progress because the annulus -- the outer

10  portion of the ring is weaker, so even the normal wear and

11  tear is going to weaken that outer layer more.

12      Q.    And let's assume, Doctor, that Rogelio had some

13  degenerative changes before this accident ever occurred.

14  Would an accident such as he was involved in when his

15  truck hit Mr. Larson's truck, would that aggravate those

16  injuries?

17      A.    Absolutely.

18      Q.    And so even though someone might have had a bad

19  back and was doing just fine, that accident would cause it

20  to become symptomatic when it wasn't before?

21      A.    Correct.

22      Q.    And if someone had a bad back prior to an

23  accident such as this, is that back going to be more

24  susceptible to injury than a healthy back?

25      A.    Any spine that has been compromised in the past

1  with additional injury would have damage to it, cause more

2  -- further damage.

3      Q.   Doctor, I believe you were provided with the

4  records from Valley Baptist Medical Center concerning

5  Rogelio; were you not?

6      A.   Yes.

7      Q.   And did you see in there if he had been to Valley

8  Baptist --

9      A.   I only have his X-ray reports.  I don't have his

10 medical reports from the hospital.

11     Q.   Back in August of 1995 -- I'm referring to the

12 Valley Baptist Medical records, apparently Mr. Rodriguez

13 went to the hospital as a result of an injury and they did

14 an X-ray of his lower spine.  Have you seen that?

15     A.   No, I haven't seen it.  No, let me see.

16     Q.   Just a simple question to ask you about it,

17 Doctor.  Just review, look at that, if you haven't seen

18 it.  Is that a normal X-ray finding?

19     A.   Yeah, it says X-ray of lumbar spine within normal

20 limits.

21     Q.   Okay.  And if Mr. Rodriguez had some pretty

22 serious changes like thinning of the disk and degenerative

23 changes, straightening of the lordotic curve, that would

24 have shown up back then; wouldn't it?

25     A.   This report would not show thinning of the disk.

Page 48

```
1    I'm stating what the radiologist states and it doesn't

2    mention anything about any other abnormalities of the

3    spine.

4        Q.    So obviously a plain X-ray is not going to show

5    all of what an MRI will?  At least there was nothing too

6    significant found in '95 or anything significant, correct?

7        A.    From that X-ray.

8        Q.    Yeah.  Doctor, what part of the spine is most

9    likely to be injured in an accident such as Mr. Rodriguez

10   was involved in?  Would it be, I mean, are there

11   particular vertebrae that are more prone to injury than

12   others?

13       A.    That's correct, but this accident was extensive

14   and the general vertebrae that are involved are Lumbar 4

15   and Lumbar 5 and L5 and S1.  But in an injury like this

16   where he's wearing a seat belt and his acceleration and

17   deceleration what is called the whiplash of the spine the

18   injuries can be from any level of the spine from L1

19   through L5-S1.

20       Q.    Now, if these injuries that Mr. Rodriguez has

21   were as a result of degenerative changes; in other words,

22   being a hard worker all his life, digging ditches or

23   driving trucks, whatever, would there be a difference in

24   what you would expect to see in the spine and how the

25   injury occurred?
```

Page 49

1      A.    Well, also you would notice that the degenerative

2  changes are also in the -- I would call more like wear-and

3  tear-changes in the entire spine, but more probably a

4  little more prominent in the lower vertebrae than upper

5  one -- L1-L2, but more probably L2-L3, L4-L5 and S1.

6      Q.    If these injuries were a result of degenerative

7  changes that occurred over a lifetime, would you expect

8  them to be evenly spread throughout the spine?

9      A.    Not necessarily.  It could be they are more

10  predominant in the lower part, but there is more tendency

11  to be evenly spread out.

12      Q.    And they are not evenly spread in Mr. Rodriguez's

13  case; is that correct?

14      A.    Actually, in his lumbar spine X-rays he doesn't

15  show any narrowing of the lumbar spine in the Valley

16  Baptist.

17      Q.    And this is important or is it not?

18      A.    Yeah, because it gives us all medical probability

19  that his injury caused all these other problems with his

20  spine.

21      Q.    And another question I have to ask you, Doctor

22  is:  Mr. Rodriguez has been complaining, has he not, about

23  numbness and pain radiating from the back into his leg?

24      A.    Yes, he was also seen by Dr. Tijmes and

25  Dr. Keillor, who's an orthopedic surgeon, and at that time

Page 50

1    indicated that he was also indicative of some irritation

2    of the nerve of the spine or compression of the nerve.

3        Q.   Now, you mentioned Dr. Keillor.  You've read

4    Dr. Keillor's report?

5        A.   Yes, I viewed his report.

6        Q.   Do you agree with those?

7        A.   I agree just in medical probability of what he's

8    saying.  We can go through that if you want, but I don't

9    agree entirely, but some facets of his work.

10       Q.   Under his impression he says, X-rays and findings

11   of this patient are not diagnostic of a ruptured disk.  Do

12   you see that?

13       A.   Yes, but he didn't have the benefit of all the

14   MRIs and all of that.

15       Q.   Well, then he goes on in that same paragraph,

16   does he not, Dr. Keillor, and he says, there is a sudden

17   lumbar lordosis at L5-S1 --

18       A.   Right.

19       Q.   -- so there may indeed be trauma at L5-S1.  It is

20   my impression the patient can very well have a problem at

21   the L5-S1.  Do you agree with that or disagree?

22       A.   I think I agree with that.

23       Q.   He does have numbness to the medial side of the

24   leg, this therefore, can be related to MRI changes.  Do

25   you agree or disagree?

1     A.    I agree with that.  I concur with that.

2     Q.    And then he goes onto say in his final findings,

3  that I would especially like the L4-L5 nerve roots be

4  checked and the S1 nerve roots.  The disks that we need to

5  worry about is L4-L5 of the lumbar spine and L5-S1 of the

6  lumbar spine?  Is that what you're telling this jury?

7     A.    Yes, that's what I agree with and what he is

8  recommending is he is recommending another study, nerve

9  study to show that.

10    Q.    Uh-huh.  Do you believe at this time, Doctor,

11 that Rogelio needs additional medical treatment?

12    A.    Yes, definitely.

13    Q.    And what is it that you are recommending?

14    A.    Mr. Rodriguez has been under care from the day of

15 his accident and his lumbar spine and his symptoms and his

16 clinical findings and diagnostic findings, that's the MRI,

17 and consultations with other specialists is consistent

18 with him requiring surgery for his lumbar spine.

19    Q.    And what type of surgery do you think would be

20 necessary?  Is it a fusion --

21    A.    Orthopedic surgeon would determine that at that

22 time.  At least he would need a diskectomy at L4-L5, L5-S1

23 with or without fusion.

24    Q.    If Rogelio does have the disk removed, does that

25 weaken the spine?

Page 52

1     A.    Correct.

2     Q.    And someone who has a disk removed like that is

3  it more probable than not, could you tell us, based on

4  reasonable medical probability, if that person would have

5  additional problems with the disk above and below that

6  vertebra?

7     A.    Any time you have surgery or have a disk problem

8  particularly after the surgery in the lumbar spine area,

9  the medical probability of further deterioration of this

10  spine is reasonable.

11     Q.    Doctor, Rogelio has been a truck driver all his

12  life, driven 18-wheelers.  Would you suggest that he

13  continue in that type of job?

14     A.    I think this can be better determined after he

15  has had his surgical procedure.

16     Q.    Would you suggest that someone climb up and down

17  stairs after a disk surgery, be it a fusion or a --

18     A.    No, I think there is a limitation after surgery

19  and if it is a fusion that he would not be able to do

20  certain things he was able to do before his surgery.

21     Q.    Would he be able to do heavy lifting?

22     A.    Definitely not.

23     Q.    Walk on rough ground?

24     A.    Possibly yes, but heavy lifting no.

25     Q.    How about standing for long periods of time?

```
 1        A.    That's troublesome also.

 2        Q.    Pardon me?

 3        A.    That's troublesome also.

 4        Q.    How about sitting for long periods of time?

 5        A.    All these people -- any time you have lower back

 6   injury and procedure done, there are a lot of activities,

 7   what we call activities of daily living or work-related

 8   activities they're not going to be able to do.

 9        Q.    And if he does things like that like riding

10   around in an 18-wheeler and bumps, is that going to

11   exacerbate his conditions?

12        A.    Yes.

13        Q.    Is it going to make him require additional

14   treatment more than if he didn't have the surgery?

15        A.    That's very likely.

16        Q.    Mr. Rodriguez has made himself go to work almost

17   every day since this accident occurred; did you know that?

18        A.    He's a very strong man.

19        Q.    Do you think that has been good for him?

20        A.    I think he is doing -- he has had a lot problems

21   with his back, but for maybe financial reasons or whatever

22   he continues to work, but I've seen him struggling to --

23   even sometimes to walk and I'm sure he's having to

24   struggle at work also.

25        Q.    Do injuries such as this affect every aspect of a
```

1  patient's life from your observations?

2      A.    Absolutely, that's absolutely correct.    It

3  affects their home life, it affects their work life, their

4  social life.

5      Q.    Do you believe, based on reasonable medical

6  probability, Doctor, that Rogelio will ever be able to

7  return to the type of person he was before this accident

8  occurred from a physical standpoint?

9      A.    I can state categorically that he is, even with

10  all the best will that he was that he is not going to be

11  able to do many of the things and other things that he is

12  doing he's doing with a considerable amount of pain and

13  stress on his body.

14      Q.    People with the problems that you have observed

15  in Mr. Rodriguez, is it, in your opinion, normal for them

16  to have difficulty with sleeping?

17      A.    More than sleeping, they have all sorts of

18  problems.    They have -- when people have chronic lower

19  pain or pain of that intensity.

20      Q.    Does it affect their relationships with other

21  family members?

22      A.    Family members, people at work, public.

23      Q.    Doctor, you said it would be easier for you to

24  tell what he could -- what Rogelio could or could not do

25  after he had the surgery that you had recommended, but

Page 55

1    looking at it right now based on reasonable medical

2    probability, your experience with people who have had the

3    injuries he's had, would you expect him to be able to

4    continue with the type of employment that he has had?

5        A.    I think over a period of time he is not going to

6    be able to handle because of his injuries, because of his

7    condition, for any length of time the work that he is

8    performing.

9        Q.    Doctor, you know, I kind of skipped over one

10   thing and that is the cervical MRI --

11       A.    Right.

12       Q.    -- which was done back on 11/13/03?

13       A.    Right.

14       Q.    Do you relate any injuries that we're seeing in

15   the cervical spine and he had pretty much the same type of

16   injuries there, do you relate those to the automobile

17   accident?

18       A.    Yes, this patient had also -- we have been

19   concentrating, focusing on the lumbar, he also had a lot

20   of problems with his neck and I treated him for his neck

21   and then we did an MRI and also the MRI shows some disk

22   changes, considerable disk changes actually and he also

23   has what I call myofascitis of his neck muscle for which I

24   would perform intermyofascial injection therapy, what is

25   called trigger point therapy on him.

7/17/2006

Page 56

1      Q.    Where you kind of give him shots?

2      A.    Into the muscle area of his neck.

3      Q.    And you did that for both the neck and the back?

4      A.    Neck and back.

5      Q.    Doctor, Rogelio had some complaints as I recall,

6    I think you mentioned in your report, about pain radiating

7    down into his arms; do you recall that?

8      A.    I have to look for my charts.

9      Q.    Is that something that you would expect to happen

10   as a result of these injuries to the neck?

11     A.    I have to review the charts.  I'm not too

12   familiar with that part.

13     Q.    Once again, that's a reasonable medical

14   probability, though, you believe the proximate cause of

15   the neck injury is also the auto accident?

16     A.    Absolutely.

17     Q.    Doctor, we've talked about the surgery that

18   Mr. Rodriguez requires to the lower back and you have come

19   up with some prognosis as to what the cause of those would

20   be; have you not?

21     A.    You don't mean prognosis, you mean --

22     Q.    Looking at your report of October the 27th.

23            THE COURT:  Excuse me, Mr. Crane, how much

24   longer are you going to be with this witness?

25            MR. CRANE:  Probably another 10 minutes.

```
 1                THE COURT:  All right.  Go ahead and finish
 2     up.  We'll take our afternoon break as soon as you finish.
 3                MR. CRANE:  May I approach the witness?
 4                THE COURT:  Yes.
 5       Q.   (By Mr. Crane:)  Let me show your October 27th
 6     report, Doctor.
 7       A.    I have that one.
 8       Q.    Okay.  Great.  You're quicker than we are.  You
 9     have shown on there that you expect that in the future
10     that Roy will require myofascial relief?
11       A.    Right.
12       Q.    What exactly is that?
13       A.    This is a particular type of therapy to relieve
14     his myofascitis and his trigger points.
15       Q.    And would that be required with or without
16     surgery?
17       A.    Yes.
18       Q.    And the next thing you suggest is medical care
19     and interomyofascial injection therapy; is that correct?
20       A.    Yeah, if you can continue therapy, obviously like
21     he had injection therapy before, he probably, medical
22     probability, he is going to require it again.
23       Q.    And then, again, you talk about a cervical
24     diskectomy and interbody fusion; what is that?
25                MR. KASPERITIS:  Your Honor, I'd like to
```

Page 58

1  object at this point to the numbers that are contained

2  here in certain portion of this exhibit or that exhibit.

3  Dr. Gill has already testified that he doesn't spend a lot

4  time in hospitals doing surgery.  He's already testified

5  what kind of surgery would be done would be in the

6  province of the orthopedic surgeon, which he is not.  This

7  would be speculative, these costs are speculative.

8  They're outside of this doctor's realm of expertise and

9  shouldn't be submitted to the jury at this time.

10            MR. CRANE:  Judge, this man is a surgeon.  He

11  deals with people everyday, refers them to doctors who do

12  the surgery.  Your Honor, I'm just asking if he is

13  familiar with the charges.

14            THE COURT:  You may continue.  Motion denied.

15            MR. CRANE:  Thank you.

16            THE COURT:  Objection denied.

17     Q.    (By Mr. Crane:)  You've also shown the cost of a

18  cervical diskectomy and interbody fusion, have you not?

19     A.    Yeah, this is approximately what orthopedic

20  surgeons have indicated for the -- this is just

21  approximate of the cost of the surgery.

22     Q.    But this is something you see everyday?

23     A.    Well, this is -- yeah, this is my business.  All

24  my work is this.

25     Q.    And then you also feel that he will need a lumbar

Page 59

1    laminectomy fusion?

2        A.    He definitely will need a lumbar laminectomy with

3    or without fusion.

4        Q.    And you have put a cost down for each of those;

5    is that correct?

6        A.    Yeah, these costs are determined mainly by

7    orthopedic surgeons.    These are the figures that are given

8    to us or I have asked the orthopedic surgeons what the

9    approximate costs are.

10       Q.    And you have stated that the total cost for the

11   future medical that you believe this man will need is

12   $109,000; is that correct?

13       A.    That's what it adds up.    Is that everything?

14       Q.    Yes.    And is that the fair and reasonable charges

15   for those procedures in this area?

16       A.    This is what I know about myofascial with the

17   diskectomy and interbody fusion.    These are approximations

18   given by the orthopedic and neurosurgeons.

19       Q.    And are they fair and reasonable charges?

20       A.    Yes.

21            MR. CRANE:    Your Honor, we ask that Exhibit

22   No. 20 be admitted, which is a summary of the charges that

23   Dr. Gill is --

24            MR. KASPERITIS:    Your Honor, I object based

25   upon the testimony by Dr. Gill.    It's speculative, it's

Page 60

```
 1   outside the witness' expertise and not appropriate to be

 2   published to the jury.

 3             THE COURT:  Noting your objections, the

 4   exhibit will be admitted.  What's the exhibit number?

 5             MR. CRANE:  That's Exhibit No. 20, your

 6   Honor.

 7                  (Plaintiff's Exhibit No. 20 was

 8   admitted.)

 9      Q.   (By Mr. Crane:)  T12?  Did Rogelio complain to

10   you about pain at T12?

11      A.   Yes, he did.

12      Q.   And what is the story with that?

13      A.   Well, he was complaining of pain in most of his

14   spine from T12, that's the lower part of the chest

15   vertebra of the L5-S1.  So we gave him an injection in

16   that area.  Then T12 and L1, that's the lower back lumbar

17   and T12 is part of the injury of his virtually all of his

18   spine.

19      Q.   Would the complaints of T12 be related to the --

20      A.   Yes, we did X-rays of that area.  I think one of

21   the orthopedic surgeons did an X-ray on that area and that

22   didn't show very much at that time.

23             MR. CRANE:  Pass the witness.

24      A.   Except for the myofascial spasms of lumbar spine

25   which is from T12 to L5, that is the muscle inflammation.
```

1          THE COURT:  Okay.  Ladies and gentlemen,

2    let's take this time to take an afternoon break.  Let's

3    take approximately a 15-minute break.  We'll be back here

4    at 3:45.  Once they come back into the room, if we could

5    have water and stuff back there; is that correct?

6          THE BAILIFF:  Yes, your Honor.

7          THE COURT:  Just take them back there and

8    bring them in at 3:45.

9          THE BAILIFF:  All rise for the jury.

10          (15-minute break was taken.)

11          THE BAILIFF:  All rise.

12          THE COURT:  Thank you.  Please be seated.

13    Mr. Kasperitis, ready?

14          MR. KASPERITIS:  May we approach, your Honor?

15          THE COURT:  Sure.

16          (The following side bar was held out

17    of the presence of the jury:)

18          MR. KASPERITIS:  Your Honor, the Court's

19    rules ask that we have the binders with the documents that

20    I'm referring.  Those were listed as Exhibit 1 through 9

21    for the Defendant.  I've given a copy to Mr. Crane.

22          (Side bar conference was finished.)

23          THE COURT:  Okay.  Mr. Kasperitis, you may

24    cross-examine.  Doctor, you may come back to the stand

25    please.  All right.

Page 62

```
 1                   CROSS-EXAMINATION
 2  BY MR. KASPERITIS:
 3      Q.   Thank you, your Honor.  Dr. Gill, my name is Pat
 4  Kasperitis and I represent Mr. Larson in this case.  You
 5  and I have not met before today?
 6      A.   I don't think so.
 7      Q.   Okay.  In response to some depositions on written
 8  questions in the case, you provided a copy of your
 9  curriculum vitae, CV?
10      A.   I don't recall.
11      Q.   Okay.  I'd like to show you that and talk to you
12  a little bit about it.
13      A.   Sure.
14             MR. KASPERITIS:  May I approach the witness?
15             THE COURT:  Yes, you may.
16      Q.   (By Mr. Kasperitis:)  Dr. Gill, is that your CV?
17      A.   Yes, correct.
18      Q.   And that lists your qualifications, your training
19  your specialty practices, those types of things?
20      A.   Correct.
21      Q.   And it says on there that you are a general
22  surgeon?
23      A.   Correct.
24      Q.   And you mentioned earlier on in your testimony to
25  Mr. Crane that you don't do a lot of hospital work
```

```
 1    anymore?

 2         A.    Correct, I don't do surgery.

 3         Q.    You don't do surgery?

 4         A.    Since I've been in the Valley.

 5         Q.    Right.

 6         A.    But in Houston, I did.  I was chief of surgery in

 7    one of the hospitals.

 8         Q.    How long have you been in the Valley?

 9         A.    This is my eighth or ninth year.

10         Q.    Okay.  So if a surgery was called for for

11    Mr. Rodriguez, you wouldn't be the one doing it?

12         A.    Correct.

13         Q.    As a matter of fact, the person who would do

14    surgery on a spine like that would ordinarily be an

15    orthopedic surgeon?

16         A.    Or a neurosurgeon.

17         Q.    Pardon?

18         A.    Or a neurosurgeon.

19         Q.    Or a neurosurgeon?

20         A.    Yes.

21         Q.    And you're aware in this case that Dr. Tijmes did

22    a surgical consult for plaintiff, correct?

23         A.    Correct.

24               THE COURT:  Counsel, I don't mean to

25    interrupt you.  We have a person in the courtroom.  Is
```

Page 64

1    that a witness?

2                MR. KASPERITIS:  No, your, Honor.

3                THE COURT:  Thank you.

4        Q.    (By Mr. Kasperitis:)  As a matter of fact, you

5    sent Mr. Rodriguez to Dr. Tijmes specifically for a

6    surgical consult within a month of seeing him, right?

7        A.    Correct.

8        Q.    And Dr. Tijmes is an orthopedic surgeon, correct?

9    And that's why you sent him there?

10       A.    Correct.

11       Q.    And Dr. Tijmes did not recommend surgery,

12   correct?

13       A.    At that stage he did not recommend surgery.

14       Q.    Correct.  And --

15       A.    He hadn't finished his investigation at that

16   time.

17       Q.    Correct.  And are you aware that Dr. Tijmes saw

18   Plaintiff again early in 2004 at the request of Mr. Crane?

19       A.    Yes, I'm aware of that.

20       Q.    And again, there was a specific request for a

21   surgical consult and there was no surgical consult in

22   2004; do you understand that to be true?

23       A.    Okay.  Repeat that.  I didn't quite follow what

24   you said.

25       Q.    Certainly.  In the records that have introduced

Page 65

1    into evidence, there's a letter from Mr. Crane to

2    Dr. Tijmes asking him to look at the patient again with an

3    eye towards the surgical consult.  Have you seen that

4    letter?

5        A.    No.

6        Q.    All right.  But you know that Dr. Tijmes saw the

7    patient again in early 2004, correct?

8        A.    I know that Dr. Tijmes saw the patient twice at

9    least.

10        Q.    And the second time he saw the patient, he did

11    not recommend surgery again, correct?

12        A.    In the report I got, yes.

13        Q.    Okay.  And you have seen Dr. Keillor's records,

14    correct?

15        A.    Correct.

16        Q.    What kind of doctor is Dr. Keillor?

17        A.    He's an orthopedic surgeon.

18        Q.    So if surgery were required for Mr. Rodriguez, he

19    would be competent to do it?

20        A.    If he has privileges at a hospital, obviously.

21        Q.    As an orthopedic surgeon, he would have that

22    training?

23        A.    Correct.

24        Q.    And he, in his report, which is in April of 2004,

25    he specifically says that doctor -- or that Mr. Rodriguez

Page 66

```
 1   is not a surgical candidate; isn't that true?
 2        A.   Well, you have to -- if you could get me the
 3   report, I will review that with you.
 4             MR. KASPERITIS:  May I approach the witness,
 5   your, Honor?
 6             THE COURT:  Yes, you may.
 7             MR. KASPERITIS:  Let me show you this binder
 8   of things that's a little smaller.
 9             THE WITNESS:  Yeah, I have one consultation
10   here.
11        Q.   (By Mr. Kasperitis:)  All right.  And what's the
12   date of that consultation?
13        A.   It's 4 -- April 5th, 2004.
14        Q.   All right.
15        A.   That the one you're talking about?
16        Q.   If you would open the black binder to Tab 8,
17   which is Defendant's Exhibit 8.
18        A.   Yeah.
19        Q.   Is that Dr. Keillor's consultation?
20        A.   Yes, 4/5/2004.
21        Q.   And that's the same one --
22        A.   Yeah, same one.
23        Q.   And the bottom right-hand corner of Exhibit 8
24   there is two numbers, one is a 5 and one is a 7; do you
25   see those?
```

7/17/2006

Page 67

1      A.    Correct, yeah.

2      Q.    And the next page has a 6 and an 8, right?

3      A.    6 and 8, correct.

4      Q.    And when you look at the middle paragraph in the

5    middle of that, where it says, MRI done on this patient on

6    10/8, some 10 months after the injury demonstrates minimal

7    findings, correct?

8      A.    Well, that's his opinion.

9      Q.    Sure.  And that's why people go to those doctors

10   is to get an opinion, right?

11     A.    Correct.

12     Q.    And at the bottom of that same paragraph his

13   conclusion is, in realty, all of these disk protrusions

14   are very tiny and are not diagnostic of a ruptured disk;

15   is that not true?

16     A.    Well, that's what Dr. Keillor states.

17     Q.    Well, if Dr. Keillor were going to be giving an

18   assessment that someone needed surgery, his opinion would

19   be important; wouldn't it?

20     A.    Correct, yes.  It would be another opinion.

21     Q.    And when you go to the next page, which has a 7

22   and a 9 at the bottom; you see that one?

23     A.    I have a 6 and 8.

24     Q.    Okay.  And then the next page, 7 and 9; do you

25   see that one?

7/17/2006

Page 68

1      A.   Yes, 7 and a 9, yes.

2      Q.   Okay.  And he says, in conclusion, I'm not sure

3   that it's anything indicative to definitely point out a

4   ruptured disk in this individual; isn't that what he

5   states?

6      A.   That's what he states, yes, sir.

7      Q.   And he recommends a neurological evaluation,

8   right?

9      A.   Yes.

10     Q.   Has that been done?

11     A.   Not to my knowledge.

12     Q.   And then the next sentence where he recommends

13   the neurological evaluation, he says -- he begins with,

14   certainly the patient does not have findings that would

15   indicate surgery at this time; isn't that his conclusion?

16     A.   That's his conclusion at that time and point.

17     Q.   Okay.  So we have Dr. Tijmes, an orthopedic

18   surgeon who says, no surgery.  And then Dr. Tijmes, an

19   orthopedic surgeon, sees him again says, no surgery.

20   Dr. Keillor, an orthopedic surgeon, says, no surgery.

21          So up until this time in April of 2003, there

22   are no findings to justify surgery, correct?

23     A.   That's the opinion of Dr. Keillor.

24     Q.   Well, in fact, when we look at your report, your

25   October 27th, 2005 report, that was your opinion too,

Ace Court Reporting Service

(956) 380-1100

1    wasn't it?

2        A.    2005?

3        Q.    Yes.   Would you look at that one, please?   Your

4    latest report.

5        A.    October 27th?

6        Q.    Right.

7        A.    Yeah.

8        Q.    Now as I understand the reports that you've given

9    and I think the exhibit that's produced by the Plaintiff

10   will bear this out:   From your initial visit with the

11   Plaintiff in October -- pardon me, August of 2003 --

12       A.    Right.

13       Q.    -- when you updated your report, you amended it

14   and you added things to the end of the report, correct?

15       A.    Correct, yeah.

16       Q.    And so you didn't generate a whole new report,

17   you just put "update" at the end?

18       A.    With the diagnostic test and the recommendation.

19       Q.    Exactly.   And so when we got the last report, we

20   got the whole history of the treatment of the patient?

21       A.    Correct.

22       Q.    And so when we're looking at your October 27th

23   report when you go to the last page, and that's in the

24   Plaintiff's Exhibit No. 9, your Honor.   Are you there?

25       A.    I'm here.

1      Q.    Okay.   Now you have, prognosis and future

2   considerations, correct?

3      A.    Right.

4      Q.    And there those prognosis and future

5   considerations are similar to the other prognosis and

6   future considerations that you've given throughout his

7   treatment, correct?

8      A.    Yes, but the surgical candidate is a

9   consideration.

10      Q.    And at the beginning or at the end of that

11   paragraph, probably about two thirds of the way down it

12   says, these remaining signs and symptoms of the patient

13   may further interrupt the patient's activities of daily

14   living; do you see that part?

15      A.    Yes.

16      Q.    And below that you describe a course of

17   conservative treatment, right?

18      A.    Right.

19      Q.    And you say that, if conservative treatments

20   fail, the patient may become a surgical candidate,

21   correct?

22      A.    Yes.

23      Q.    That was your opinion in October 27th, 2005,

24   right?  Yes?

25      A.    Correct.

Page 71

1     Q.    And that's your opinion today; isn't it?

2     A.    My opinion -- because at that time I was -- I had

3    available further diagnostic tests like the MRIs that were

4    done, so at that time I felt like the patient, in all

5    medical probability, would be a candidate for surgery.

6     Q.    If the conservative treatments fail; that's what

7    you say here, isn't it?

8     A.    Yes, conservative treatment doesn't mean to say

9    you have always to have conservative treatment to be a

10   surgical candidate.

11    Q.    All right.  Well, has Dr. Tijmes, who might do

12   this kind of surgery, seen the patient since that time?

13    A.    Not to my knowledge.

14    Q.    So you don't have any knowledge of him having

15   recommended the surgery since October 27th, 2005, correct?

16    A.    The last report I have was the one that we

17   discussed.

18    Q.    And Dr. Keillor hasn't seen him since October of

19   or since April of 2004, gone ahead and recommended

20   surgery, has he?

21    A.    Well, none of the orthopedic surgeons, both of

22   them, sorry, haven't seen the patient in -- either in 2005

23   or 2006.

24    Q.    So there is no recommendation from an orthopedic

25   surgeon that surgery is appropriate?

Page 72

1      A.    Well, they haven't seen him in 2005.

2      Q.    Well, sir, October 27th, 2005, when you last saw

3   him is eight, nine months ago?

4      A.    Right.

5      Q.    Would you expect that you would know about it if

6   he had -- if Mr. Rodriguez had seen someone else in the

7   interim time?

8      A.    Well, the last time -- I haven't had any report

9   from Dr. Tijmes or Dr. Keillor since then, but...

10      Q.    Well, if you were to -- you're in front of the

11   jury giving them an opinion that there may be a surgery on

12   the horizon for Mr. Rodriguez, don't you think it's

13   important that you have as complete information as humanly

14   possible when you make that statement to these folks who

15   are giving up their time for us?

16      A.    Well, I have reports of the MRI and letters for

17   the diagnostic tests that were done and based on this,

18   that it's my opinion, not the opinions of Dr. Tijmes

19   and/or Dr. Keillor that I'm giving.

20      Q.    Are you aware that Dr. Tijmes' deposition was

21   taken last summer?

22      A.    I was not aware until recently.

23      Q.    Okay.  And that was after the time that you

24   gave -- you got your report of October 2004 regarding the

25   changes in Mr. Rodriguez's file?

Page 73

1    A.    Right.

2    Q.    So Dr. Tijmes gave his deposition testimony after

3    a time when that information was available and he again

4    did not recommend surgery; isn't that true?

5              MR. CRANE:  Your Honor, I'm going to object

6    to this --

7    A.    I don't know about that.

8              MR. CRANE:  -- I'm going to object suggesting

9    to what Dr. Tijmes may or may not say.  It's not

10   evidence.

11             THE COURT:  Overruled.  You may continue.

12   Q.    (By Mr. Kasperitis:)  Dr. Tijmes still to this

13   day, despite his deposition testimony, has not recommended

14   surgery for this patient; isn't that true?

15   A.    I don't know Dr. Tijmes' deposition.

16   Q.    So you have no knowledge of --

17   A.    No knowledge.  Only what was mentioned this

18   afternoon in court.

19   Q.    All right.  Now, I wanted to ask -- may I

20   approach the witness, your Honor?

21             THE COURT:  Yes, you may.

22   Q.    (By Mr. Kasperitis:)  The last exhibit in

23   evidence is No. 20.  You can keep that, we may look at it

24   again.  Is Exhibit No. 20?

25   A.    Yeah.

Page 74

1    Q.    And that was the last one that got in before the

2    break, right?

3    A.    This one?  I have not seen this, okay.

4    Q.    That's the one that just got put into evidence

5    right before the break, No. 20.

6    A.    Yeah.

7    Q.    All right.  Now, the first four items on No.

8    20 --

9    A.    Right.

10    Q.    -- those are the conservative treatments that you

11    recommend in your October 27th letter, right?

12    A.    These are some of the options we have for

13    conservative treatment.

14    Q.    Well, if you look at your prognosis future

15    considerations, it looks to me like every one of those

16    four are what you'd recommend to happen prior to the time

17    that surgery happens.

18    A.    That's not my recommendation.  I said we can try

19    some of these conservative, not necessarily all of them

20    that you have included, but it's an opinion of the surgeon

21    that the patient is a surgical candidate at that

22    particular time.  We don't have to go through those

23    conservative measures.

24    Q.    So true, regarding a future surgery, you would

25    rely on an orthopedic surgeon's judgment rather than your

1   own; isn't that true?

2       A.    The orthopedic surgeon is the one who is going to

3   do the surgery.

4       Q.    All right.  But these first four things you might

5   do yourself?

6       A.    I would only do the first two.

7       Q.    The first two?

8       A.    Right.

9       Q.    Okay.

10      A.    I would defer the other two to a pain management

11  person.

12      Q.    All right.  My understanding of your practice is

13  that you have a pain management facility in addition to

14  your sports rehab facility; is that true?

15      A.    We have what is called industrial medicine.  We

16  deal with worker's comp, pre-screen, simple low back

17  injuries, other injuries.

18      Q.    All right.  So back to where we were.  The

19  concept of surgery after conservative treatment and only

20  if it fails, that's a prudent course of conduct; don't you

21  think?

22      A.    Correct.

23      Q.    For one thing, the conservative treatment is less

24  invasive or less uncomfortable for the patient, correct?

25      A.    But at some point it may be necessary for

1  determination that you don't have to go through all the
2  conservative treatment if the patient's condition at that
3  time warrants surgical intervention.

4      Q.   But the surgeon should at least make sure that
5  some of them is going through, true?

6      A.   That's individual orthopedic surgeon's evaluation
7  of the condition at that time.

8      Q.   All right.  Well, if you'll look at that Exhibit
9  No. 9, I don't know if you have that in front of you or do
10 you just have your records?

11     A.   What's Exhibit 9?

12     Q.   It is your records.

13     A.   Oh, my records.

14     Q.   Yes, sir.  Your, Honor, could I approach with
15 Exhibit 9?

16              THE COURT:  Yes, you may.

17     Q.   (By Mr. Kasperitis:)  This is Exhibit 9 as it's
18 been entered and if you'll look at the page that I've
19 opened to on Exhibit 9.

20     A.   Right.

21     Q.   The page that I'm looking for is on Exhibit 9 and
22 it's at the very beginning and it is your billing
23 statement dated 5/4/2006, correct?

24     A.   Correct, yeah.

25     Q.   So that's just a couple of months ago, right?

Page 77

1      A.    The last portion?

2      Q.    Yes.

3      A.    Yeah.

4      Q.    And does this reflect all of the visits that
5  Mr. Rodriguez had in your office?

6      A.    I think his last visit was in April, I think his
7  last -- according to this, his last visit, the billing
8  records was 2005 June.

9      Q.    Well, the next page actually continues.  There is
10  two pages and it shows your October visit as well.

11      A.    October, that's right.

12      Q.    All right.

13      A.    That was the last when the report was written,
14  yes.

15      Q.    Okay.  Now the conservative treatment that would
16  be -- is it your opinion that conservative treatment is
17  beneficial to your patients?

18      A.    In some situations, yes.

19      Q.    Certainly you don't recommend treatments for your
20  patients that aren't going to help them?

21      A.    Correct.

22      Q.    So you want to help them and the conservative
23  treatments are less invasive, right?

24      A.    Epidural injections are not less evasive.

25      Q.    Less invasive than a laminectomy, sir?

Page 78

1       A.   Yes, that's true.  Everything is relevant in this

2   case.

3       Q.   Yes, sir.  Now, the billing records that we're

4   looking at, Page 1 and 2, they show your first visit

5   8/20/2003, right?  And then there's a couple of visits in

6   September, right?

7       A.   Yes.

8       Q.   And then there's a couple of visits in October of

9   2003, correct?

10      A.   Right.

11      Q.   And there's one in December 2003?

12      A.   Whatever is on the billing.

13      Q.   12/22, right?

14      A.   Right.

15      Q.   And then the next is 1/20/2004, right?

16      A.   Yes.

17      Q.   And then there's one February, 2004, right?

18      A.   Yes.

19      Q.   And then about a year and four months goes by

20  where there's no conservative treatment being applied at

21  all; isn't that true, sir?

22      A.   Well, yes, according to these records, yes.

23      Q.   And you don't have any knowledge of any other

24  conservative treatment besides what you were giving him;

25  do you?