Page 79

1    A.    I'm not aware that he was being treated somewhere

2    else perhaps only Dr. Tijmes or Dr. Keillor.

3    Q.    And when we look at the medical records that are

4    into evidence as Exhibit No. 10 -- may I approach the

5    witness, your Honor?

6            THE COURT:  You may.

7    Q.    (By Mr. Kasperitis:)  Okay.  Those are the

8    records from the rehabilitation portion of your practice,

9    correct?

10    A.    Correct, yes.

11    Q.    That's OIS Rehab?

12    A.    Yes, sir.

13    Q.    And those records show that you stopped providing

14    any conservative treatment for Mr. Rodriguez in October of

15    2003; isn't that true?

16    A.    Maybe he didn't have any therapy after that

17    period, but I think he had some injection therapy on two

18    occasions.  I have the dates if you like.

19    Q.    Okay.  But his physical therapy regiment was

20    done?

21    A.    Yeah.

22    Q.    And after that time is when he saw Dr. Tijmes,

23    right?

24    A.    I presume.

25    Q.    Well, Dr. Tijmes saw him in November -- 11/11/03

Page 80

1   is what you testified to, right?

2       A.   Yeah.

3       Q.   And then you saw him again February 24th, 2004,

4   correct?

5       A.   Yes.

6       Q.   And so after the time that you finished your

7   physical therapy regiment, Dr. Tijmes still saw the

8   patient and he still thought he was not a surgical

9   candidate; isn't that true, sir?

10      A.   Well, the only report I have from Dr. Times is

11  the last one we discussed.

12      Q.   All right.  Do you have any reports where

13  Dr. Times has recommended surgery?

14      A.   No, the last report that I have from Dr. Times

15  was in 2/4/04 -- February.

16      Q.   All right.  Now, we talked about the benefits of

17  the conservative treatment being that it was less

18  invasive.  Isn't another one of the benefits that it's

19  less expensive?

20      A.   Yes, obviously.

21      Q.   A lot less expensive; isn't it?

22      A.   Yes.

23      Q.   Now, going back to your resume or CV.

24      A.   Right.

25              MR. KASPERITIS:  Your Honor, for purposes of

Page 81

1    clarity, may I mark that as Exhibit 10, Defendant's 10?

2                  THE COURT:   Yes.

3                        (Defendant's Exhibit No. 10 was

4    marked for identification.)

5      Q.    (By Mr. Kasperitis:)   Now, you gave some opinions

6    to Mr. Crane about a closed head injury?

7      A.    Right.

8      Q.    Remember that?

9      A.    Right.

10     Q.    And you said that it would require a

11   neuropsychological evaluation?

12     A.    Right.

13     Q.    Now, looking at your resume, you are not a

14   neuropsychologist?

15     A.    I'm not.

16     Q.    You would not have any of the credentials to do

17   that kind of analysis?

18     A.    I don't have the training.

19     Q.    Right.   I mean, that's a specific specialized

20   area of medicine?

21     A.    Correct.

22     Q.    If you had wanted a neuropsychological evaluation

23   of your patient, Mr. Rodriguez, like when you sent him to

24   Dr. Tijmes, you could have sent him to a

25   neuropsychological physician, correct?

Page 82

1      A.    Yes, but my -- there are limitations imposed on

2   me on where I can send the patient because I can refer the

3   patient for neuropsychological evaluation, but

4   arrangements for the patient to be seen by a

5   neuropsychologist are made by the persons who are going to

6   reimburse the neuropsychologist.

7      Q.    All right.  Well, I don't see a request in there

8   even that he see a neuropsychologist.  I don't see it

9   there.  Am I missing it?

10     A.    No, we didn't request it.

11     Q.    All right.

12     A.    Yeah.

13     Q.    And probably what the neuropsychologist would do

14  is he would do a CAT scan, wouldn't he?

15     A.    Neuropsychologist wouldn't do that.

16     Q.    No?

17     A.    Neurologist would do that.

18     Q.    Neurologist?

19     A.    This would be a neurologist.  Probably an MRI,

20  not a CAT scan.

21     Q.    All right.  Now, you were talking about swelling

22  in the brain and brain fluids that were out of whack.  CAT

23  scan for that?

24     A.    CAT scan is good in emergency status.

25     Q.    Okay.  I noticed in all records that I've looked

Page 83

1    at that there are no brain scans, no CAT scans of the

2    brain, no MRIs of the brain?

3         A.    Correct.

4         Q.    So nobody followed up on that closed head injury

5    that you know?

6         A.    Yes.

7         Q.    So nobody -- is that because nobody took it

8    seriously or that it wasn't an injury that was acute or

9    what was the reason for that?

10        A.    This is a more pragmatic reason that

11   neuropsychologists sometime refer the patient, but I have

12   no ability as such to refer to the neuropsychologist

13   because I don't know whether they would accept the

14   referral or not.

15        Q.    Well, now hang on.  Let me make sure I understand

16   what you're telling me.

17        A.    Yeah.

18        Q.    You won't refer them to the neuropsychologist out

19   of fear that it might not get reimbursed?  Is that what

20   you're saying?

21        A.    No, I suggest to the persons who are going to

22   reimburse that I want to refer to neuropsychologist.  If I

23   don't get the approval, I don't refer to

24   neuropsychologist.

25        Q.    Well, now, you're on the patient's side, right?

1    A.    Right.

2    Q.    You don't care who pays the bills?  If he needs

3  it, you want it to be done, right?

4    A.    From what I know it won't be done unless the

5  neuropsychologist is reimbursed.

6    Q.    But it certainly won't be done if you never

7  recommend it, right?  It'll never happen?

8    A.    Right.

9    Q.    All right.  So the first step is that you have to

10  recommend it?

11    A.    Right.

12    Q.    So if it's important enough to note in your

13  reports, isn't that consult something that's important

14  enough to recommend?

15    A.    At some state, yes.

16    Q.    But it's never been recommended, even up till

17  today, correct?

18    A.    It still can be recommended.

19    Q.    It still can be, but we're in trial now.  That

20  would look bad; wouldn't it?

21    A.    Yeah.

22    Q.    I also notice in looking at your report or your

23  curriculum vitae that you're not a radiologist; is that

24  true?

25    A.    That is correct.

Page 85

1    Q.    And so when you are making your interpretations

2    of the reports that were written by board certified

3    radiologists, Dr. Bennos and Dr. Berger, that is just your

4    interpretation of their word; isn't it?

5    A.    Their evaluation, like their interpretation of

6    their work, correct.

7    Q.    And the truth of the matter is that Dr. Bennos,

8    in his report, he cites degenerative changes several

9    times; doesn't he?

10   A.    He also cites disk edema several times.

11   Q.    Okay.  But he does cite degeneration; doesn't he?

12   A.    Right.

13   Q.    All right.  Degeneration isn't something that

14   happens one day, it happens over time, correct?

15   A.    Correct.

16   Q.    And a 35-year-old guy's spine is going to be

17   different than a 45-year-old guy's spine, right?  That's

18   due to the work they perform, correct?

19   A.    Correct.

20   Q.    It's due to how well they take care of

21   themselves?

22   A.    Right.

23   Q.    It's due to, like I'm getting a little fatter, my

24   back hurts a little bit more.  That's normal, right?

25   A.    Right.

Page 86

1    Q.   So all those things, all parts of everyday life

2  contribute to disk degeneration; is that true?

3    A.   Correct.

4    Q.   And I bet you have treated literally hundreds of

5  patients who have herniated disks lifting something that

6  was too heavy improperly; isn't that true?

7    A.   Yes.

8    Q.   So that happens a lot, doesn't it?  And that

9  happens whether you have a truck accident two years before

10  or not; doesn't it?

11    A.   I'm sorry.

12    Q.   A guy with a perfectly healthy spine can herniate

13  a disk with no previous injuries just by lifting something

14  the wrong way; is that true?

15    A.   Yes.

16    Q.   It happens all the time, doesn't it?

17    A.   Not all the time.

18    Q.   Have you treated a few hundred patients that way

19  over the years, sir?

20    A.   Yes.

21    Q.   Yes.  Now the bottom line is that there are some

22  doctors who have testified in court, I'm sure you've heard

23  it, that you can herniate your disk with a sneeze; have

24  you ever heard about that?

25    A.   Everything's possible.

Page 87

```
 1      Q.   Right.  And that's the answer they usually give

 2   when I ask about it, everything's possible.  Have you ever

 3   heard about that?

 4      A.   Well, I've heard of it, but this is a question

 5   that doesn't need an answer from me.

 6      Q.   Just silly, right?

 7      A.   Yeah, right.

 8      Q.   Okay.  But certainly lifting something the wrong

 9   way that's too heavy can do that, correct?

10      A.   Correct.

11      Q.   And you've testified earlier that you thought

12   that you didn't give much credence to that injury that

13   Mr. Rodriguez suffered in August of 2004, you didn't take

14   it very seriously; is that true?

15      A.   Seriously -- I was still considering him for the

16   injuries that he had since the accident and these were

17   just continuation of those symptoms and signs.

18      Q.   Well, would it surprise you to learn that he said

19   he couldn't move because of that?

20      A.   Well, I wouldn't be surprised like while you're

21   lifting you can sprain your back and be very healthy

22   afterwards and you're not able to lift for a particular

23   period of time.

24      Q.   It was so painful he couldn't move is what he

25   testified to; you understand that?
```

1    A.    Right.

2    Q.    Does that indicate a serious injury to you or

3    not?

4    A.    Not necessarily, no.

5    Q.    Not necessarily?

6    A.    It indicates severe muscle spasms.

7    Q.    But when you have the finding afterwards that you

8    have in the October of 2004 MRI, does that indicate to you

9    that it's more serious than you first thought?

10    A.    No, not necessarily because he had previous -- he

11    had this major accident and that's a continuation of those

12    injuries.

13    Q.    But for 20-something months after that major

14    accident, he had no herniated disk; isn't that true?

15    A.    Well, that's just a progression.  He had some --

16    he had disk problems all along and this is just one time

17    span of that, that change of his injury of the disk.

18    Q.    All right.  So to make sure I understand your

19    testimony:  He had disk problems prior to this truck

20    accident, true?

21    A.    I'm not suggesting that.

22    Q.    Well, you said he had it all along?

23    A.    I'm suggesting since the accident.

24    Q.    Oh, okay.  I want to make sure I'm clear.

25    A.    Right.

Page 89

1     Q.   Now, at the end of his questioning, Mr. Crane

2   asked you about a previous disk injury or low back injury

3   that he had in '95; remember that?

4     A.   I don't recall.  Sorry, sir.

5     Q.   All right.  Okay.  Let me ask you this:  You've

6   testified on your direct examination that once you have an

7   injury to the back, it can continue to get worse over

8   time, right?

9     A.   Right.

10    Q.   Does it ever heal?  Is there ever a case when

11  somebody has an injured back and it heals?

12    A.   Sometimes never.

13    Q.   Sometimes never, but does it ever heal?

14    A.   I don't know the percentages, but injury to the

15  back, particularly if it's severe enough, continues with

16  some sort of residual symptoms.

17    Q.   Now, I want to make sure I understand your

18  opinions.  Are you saying that someone who hurts their

19  back in a car accident, that if they have a herniated disk

20  25 years later that they can relate it back to that car

21  accident?

22    A.   I'm not saying that.

23    Q.   All right.  How about 15 years?

24    A.   I'm stating for this patient, okay?  So if -- I'm

25  not able to comment on 15 years or 20 years some

Page 90

1   hypothetical patient.

2        Q.   Well, I want to talk about this patient.

3        A.   Right.

4        Q.   Because this patient has a back injury five years

5   ahead of time and then he has complaints of disk injury a

6   couple of years after the car wreck and your testimony is

7   that once you hurt the spine it's going to continually get

8   worse; isn't that true?

9        A.   Well, yeah, it -- if the injury is severe enough

10  it can progress to a stage that it's going to go on

11  getting further injured.

12       Q.   Okay.  And the records from Valley Baptist

13  Medical Center that Mr. Crane showed you --

14       A.   Right.

15       Q.   -- indicated that he hurt his back three or four

16  days before he went to the hospital and it hurt so bad

17  three or four days that he had to go to the hospital.

18  Have you had a chance to look at those on the break?

19       A.   Can you repeat that again?

20       Q.   Sure.  The records that Mr. Crane showed you

21  right before the break showed that there was a back injury

22  and some X-rays in 1995?

23       A.   Right.

24       Q.   And the rest --

25       A.   He only showed me X-rays.

1     Q.    And the rest of those records show that three or

2     four days prior to the injury to the spine --

3     A.    Right.

4     Q.    -- the time when he went to the hospital was when

5     he actually hurt himself and that it got to the point that

6     it was unbearable and that's why he went to the hospital;

7     do you understand that?

8     A.    I don't know what you're trying to say.

9               MR. CRANE:  Objection.  I think he's going to

10    be asking him questions about some records.  Can Dr. Gill

11    have the privilege of looking at the records?

12              MR. KASPERITIS:  If he doesn't have them I'd

13    be happy to give him one, your Honor.  May I approach the

14    witness?

15              THE COURT:  Yes, you may.  Do you know which

16    ones they are?

17              MR. KASPERITIS:  Yes, sir.  This is Exhibit

18    13.

19              THE WITNESS:  This is the hospital records?

20              MR. KASPERITIS:  Yes, sir.

21              THE WITNESS:  This is not for this accident?

22              MR. KASPERITIS:  No, sir.

23              THE WITNESS:  This is for some other

24    accident.

25              MR. KASPERITIS:  Yes, sir.

7/17/2006

Page 92

1          THE WITNESS:  Would you happen to know what
2     date this was?  I'm having a hard time reading this.
3          MR. KASPERITIS:  Yes, it says up at the top
4     on the left-hand corner, August 17, 1800 hours.  It's in
5     handwriting.
6          THE WITNESS:  2003?
7     Q.   (By Mr. Kasperitis:)  Yes -- no, no, no.  It's on
8     the bottom and this is just a discharge report.  You see
9     in the lower right-hand corner where the discharge date
10    and time is?
11    A.   Yeah, 1 --
12    Q.   And it says --
13    A.   09/22/something.
14    Q.   '95, right?
15    A.   Right.
16    Q.   Okay.
17         THE COURT:  Is that in this folder?
18         MR. KASPERITIS:  Yes, your Honor, it is No.
19    9, Defendant's Exhibit No. 9 and it is the first page.
20         THE COURT:  Okay.
21    Q.   (By Mr. Kasperitis:)  Now, let's look at the
22    notes here.  All right.  It says there was a skid and a
23    lifting with three others; do you see that?
24    A.   Right.
25    Q.   And four days of back pain?

Page 93

1       A.    Right.

2       Q.    So pain under his rib cage when he takes a deep

3   breath; do you see that in there?  That notation?

4       A.    Right.

5       Q.    Does that sound like serious back pain to you,

6   four days?

7              MR. CRANE:  Your, Honor if I may object.  For

8   fairness, there's a section in there that opposing counsel

9   failed to read to the jury.  May I read that?

10             THE COURT:  A what?

11             MR. CRANE:  Then minimal pain a few days --

12  past days.

13      Q.    (By Mr. Kasperitis:)  And then, increased pain,

14  worked Friday today.  Four days of pain, right?  Is that

15  how you read it?

16      A.    Yes, whatever it states in there.

17      Q.    That a serious back injury, four days of pain, or

18  not?

19      A.    Well, we have seen pain with muscle spasms.

20  People have pain for three or four days, they take

21  medicine for muscle spasms, and they can improve.

22      Q.    And the diagnosis was low back pain syndrome,

23  right?

24      A.    Right.

25      Q.    Low back pain syndrome, is that a chronic thing

Page 94

1    or that an acute thing?

2         A.    Actually low back pain syndrome is not an

3    appropriate diagnosis, just low back pain.

4         Q.    All right.  Once it's low back pain, is it your

5    opinion that it's going to keep coming back?

6         A.    I'm talking about low back pain that has some

7    structural changes in the body like the disks or the

8    muscles that were -- there are a low back -- a lot of

9    acute lower back pain.  Somebody lifts something three,

10   four days, they take medicine, they get a little

11   treatment, they get better.

12        Q.    So before you relate it back you'll require

13   structural changes in the spine, correct?

14        A.    I'm talking about continuous long-standing lower

15   back pain.

16        Q.    And before you'll relate it back, you would like

17   to see some structural change in the physiology of the

18   spine?

19        A.    Right.

20        Q.    Degenerative changes that happen over time, that

21   doesn't count; does it?

22        A.    No, degenerative changes as such continue to be,

23   but even if you have degenerative changes any injury that

24   even with superimposed on the degenerative changes still

25   has validity.  They're still hurt, okay?  Degenerative

Page 95

1    changes maybe with pain, maybe with not pain.

2        Q.    Are you familiar with Dr. Cano?  You mentioned in

3    your report that --

4        A.    No, I'm not familiar with him.

5        Q.    You're not familiar with him at all?

6        A.    No.

7        Q.    And if you look at your report, Plaintiff's

8    Exhibit No. 9, that last document?

9        A.    My report?

10       Q.    Yes, sir.  October 27th, 2005 report.

11       A.    Okay.

12       Q.    It's contained in Plaintiff's Exhibit No. 9, the

13   last document.

14       A.    Sorry.  Say that again?

15       Q.    The last document in Exhibit No. 9.

16       A.    Oh.

17       Q.    It's about eight pages long, so it would be the

18   last eight pages, your October 27th, 2005 amended report.

19       A.    You want me to look on this one (indicating)?

20       Q.    Yes.

21       A.    Okay.  I got it.

22       Q.    All right.  In the history part of that when you

23   first saw Mr. Rodriguez, in that first paragraph under

24   history, it says, the patient also underwent treatment

25   under Dr. Cono, C-o-n-o --

Page 96

1      A.    I think that must be a typographical error.    It
2  should be an "a."

3      Q.    Okay.  So that would be Dr. Cano?

4      A.    Cano, yes.

5      Q.    And you have reviewed his records and
6  treated this patient?

7      A.    No, I don't have this record.

8      Q.    Okay.  Now his records have been presented to the
9  jury as an exhibit in the case.  Are you aware that
10 Dr. Cano released Mr. Rodriguez to return to work?

11     A.    No, I wasn't aware of that.

12     Q.    So whatever those records reflect, that's what --

13     A.    Yeah, I only got that information from the
14 patient was that he had treated with Dr. Cano for maybe
15 seven months, four months, something like that.

16     Q.    All right.  And if we look at that black binder
17 again.

18     A.    Yes.

19     Q.    Looking at Exhibit No. 5, Defendant's 5, your
20 Honor.

21     A.    Yeah.

22     Q.    About three pages in there's a Page No. 21, you
23 see that?  It's in the lower right-hand corner?

24     A.    This is on 5, Exhibit 5?

25     Q.    I'm sorry.  It's Exhibit 4.  I apologize.  I

Page 97

```
 1    turned the wrong tab.

 2         A.    Not a problem.  This is Dr. Cano?

 3         Q.    Yes, Dr. Cano.  You recognize that form?

 4         A.    Exhibit 4.  That's worker's comp claim.

 5         Q.    Now, in the middle there, do you see the document

 6    that says Page 21?  May I approach, your Honor?

 7               THE COURT:  Yes, you may.

 8         A.    I got it.

 9         Q.    (By Mr. Kasperitis:)  You got it?

10         A.    Yes, it's okay.

11         Q.    It's a little hard to see.  I didn't want to take

12    all your time with the question.  So it says, return to

13    regular work 2/28/03, right?

14         A.    Right.

15         Q.    And date and time of visit was 2/28/03 at 8:45,

16    right?  In the bottom left-hand corner?

17         A.    Yes, final visit was 2/28/03.

18         Q.    Right.  And it was signed by the Plaintiff and

19    the doctor, right?

20         A.    Correct.

21         Q.    Okay.  And if you go back there on Page No. 13?

22         A.    Yes, I got it.

23         Q.    And don't describe what that form is, I just want

24    you to tell me that you recognize that.

25         A.    Yes, I'm a designated doctor for Texas Workforce
```

Page 98

1    Commission, so I'm familiar with this.

2        Q.    All right.

3        A.    Okay.  And this is what is called impairment

4    rating.

5        Q.    And the impairment rating is zero; isn't it?

6        A.    Well, yeah, but --

7        Q.    And the date on that is 12/22/03 --

8              MR. CRANE:  Excuse me.  I think the doctor

9    was trying to finish his question.

10             MR. KASPERITIS:  I'm sorry.

11             THE COURT:  Give him time to answer.

12             MR. KASPERITIS:  I'm sorry.  I apologize,

13   your Honor.  I apologize to you, Doctor.

14       A.    Okay.  This doctor, I don't know how familiar he

15   is with worker's comp.  This is totally incorrect.  What's

16   called MMI, maximum medical improvement and impairment

17   rating.  I'm going to say this patient has not reached

18   maximum medical improvement.  He was still under treatment

19   with fractured ribs and then he's giving him zero percent

20   impairment with no diagnostics a week later or whatever

21   time it was after the injury.  This is totally incorrect.

22       Q.    I'm sorry.  Are you finished?

23       A.    Yes.

24       Q.    Nobody appealed that; did they?

25       A.    Well, it's not -- I did not have this

Page 99

1    information.

2        Q.    Well, I mean, you knew that Mr. Rodriguez was

3    injured in the course and scope of his employment; didn't

4    you?

5        A.    I'm not familiar.

6        Q.    Well, don't you --

7        A.    I did not treat him under Texas Workforce

8    Commission.

9        Q.    So the impairment reading from Dr. Cano is zero;

10   isn't it, sir?

11       A.    That's totally incorrect impairment.

12       Q.    So you disagree with his impairment rating?

13       A.    I vehemently disagree with that.

14       Q.    Pardon me?

15       A.    I vehemently disagree with that.  Usually

16   impairment rating is given by designated doctor not by

17   treating doctor.  That's selected by the Texas Workforce

18   Commission.

19       Q.    Okay.

20       A.    Yeah.

21       Q.    So you disagree with his finding?

22       A.    Absolutely.

23       Q.    Is there another impairment rating that you are

24   aware of besides his impairment rating of zero?

25       A.    No.

Page 100

```
 1       Q.   Dr. Gill, do you know when your next appointment

 2   with Mr. Rodriguez is?

 3       A.   Mr. Rodriguez visits me when he -- he has

 4   problems.

 5       Q.   I've seen that notated in people's files as PRN?

 6       A.   Right.

 7       Q.   That means "as needed"?

 8       A.   As needed, yes, sir.

 9       Q.   I don't see from your report that he has seen you

10   since October of 2005?

11       A.   Yeah, that's correct.  He hasn't seen me.

12       Q.   So he hasn't needed to come and see you in that

13   time; isn't that true?

14       A.   Well, he came six months.

15       Q.   He's not dissatisfied with the treatment that you

16   have provided, has he?

17       A.   I can't answer.

18       Q.   He hasn't expressed to you; has he?

19       A.   No.

20       Q.   And he asked you to come here and testify on

21   behalf of him, right?

22       A.   I was subpoenaed to come.

23       Q.   Kind of like the draft board?

24       A.   Right.

25            MR. KASPERITIS:  That's all the questions I
```

Page 101

1    have right now.  Thank you, Doctor.

2                    THE COURT:  All right.  Do you have any

3    redirect?

4                    MR. CRANE:  If I may, Judge.  It won't take

5    long.  Do it in 15 minutes, I assure you.

6                    REDIRECT EXAMINATION

7    BY MR. CRANE:

8        Q.    You were asked questions about the fact that

9    Dr. Times and Dr. Keillor did not recommend surgery on the

10   dates that they saw -- I think Dr. Keillor saw this man

11   once?

12       A.    Right.

13       Q.    Dr. Times twice.

14       A.    Twice.

15       Q.    Would you have recommended surgery at that time?

16       A.    At that time?  In stage?

17       Q.    Yeah.

18       A.    No, not with those.

19       Q.    And at that time -- Dr. Times saw Rogelio

20   November of '03, December of '03 and February of '04 and

21   Dr. Keillor saw him on 4 --

22       A.    4/5/04.  April 5th.

23       Q.    That was before this second MRI?

24       A.    Yes, correct.

25       Q.    The second MRI was done 10/2/04, correct?

Page 102

1      A.    Huh?

2      Q.    The one that shows that the thing is getting

3    worse?

4      A.    I have 10/2/04, correct.

5      Q.    So when Dr. Times and Dr. Keillor saw him, they

6    did not have the benefit of this second MRI that you had

7    the benefit of having?

8      A.    This is my understanding because they don't

9    mention it in the reports.

10     Q.    Have you done about all you can for Rogelio at

11   this point except for surgery?

12     A.    I'm going to say we -- this patient has been

13   having problems particularly with his lower back for a

14   considerable period of time and I think we should follow,

15   at least he should be given the benefit of another

16   consultation with an orthopedic surgeon who will consider

17   surgery for him.

18     Q.    But you feel that that's --

19     A.    In my opinion, yes, he definitely needs surgery,

20   but I think an orthopedic surgeon will have to agree with

21   that, to perform the surgery.

22     Q.    You were asked some questions about Rogelio's

23   1995 visit -- you were asked some questions about

24   Rogelio's visit to Valley Baptist Medical Center in '95;

25   do you recall that?

1       A.    Yes, I've got the records here.

2       Q.    Somewhere -- I've been throwing this stuff

3    around.  We have got the book closed.  May I approach the

4    witness, your Honor?

5                THE COURT:  Yes, you may.

6       Q.    (By Mr. Crane:)  Some of this was not read to

7    you, Doctor.  What does this say right here and this is

8    the history of chief complaint, Valley Baptist Medical

9    Center on 8/22/95.  What does that say?

10      A.    You would like me to read it?

11      Q.    I can read it and you can tell me what it means.

12   He apparently had minimal discomfort soon after event for

13   we assume three days.  He had ever increasing discomfort

14   in his low back.  Minimal discomfort, what does that

15   suggest to you?

16      A.    Minimal discomfort.

17      Q.    Okay.  And they did straight leg raising tests

18   and those were negative.  Why is that important?

19      A.    That means that he didn't have any impingement on

20   any of his nerves.

21      Q.    And that would indicate there was no herniation

22   at that time?

23      A.    Clinically.

24      Q.    Clinically?  And they also did an X-ray and once

25   again that was unremarkable?

Page 104

1      A.    Correct, there was no disk matter.

2      Q.    And there have been no other records up until the

3  truck accident that you're aware of, are there, that he

4  had to see somebody about his back again?

5      A.    No, even I was not familiar with those records.

6      Q.    If someone had a serious injury in '95 from what

7  you told this jury previously, you would expect them to go

8  back to a doctor; would you not?

9      A.    Yeah, right.  And some further diagnostic tests

10 performed like MRI.

11     Q.    Has anything been asked of you, Doctor, by

12 opposing counsel that changes your opinions in any way

13 that you give to this jury about Rogelio's current

14 condition?

15     A.    No, I remain on my original opinion on what I

16 stated.

17     Q.    And Doctor, are observations made by laymen of

18 how people are getting on important?  Can laymen observe

19 how somebody is doing physically?  Is that something that

20 you can consider?

21     A.    Well, if there is an obvious inability to do

22 something, yes.

23     Q.    So you would take those things into consideration

24 too?

25     A.    Well --

Page 105

1      Q.    Did you notice that in Dr. Keillor's report there

2   is a statement that Rogelio, from time to time, was having

3   bladder control problems?

4      A.    No, I don't see that.

5      Q.    I'm referring to Page 6 of Dr. Keillor's

6   records.  Okay.  I'm looking at Page 7, Dr. Gill.

7      A.    Whose report are you looking at?

8            MR. CRANE:  Can I approach the witness?  Be

9   quicker for me to show it to you than have you look for

10  it.  This is Exhibit No. 11.  These are the records of

11  Dr. Keillor.

12     A.    Yeah.

13     Q.    (By Mr. Crane:)  I'm asking you to look down on

14  Page 7 under ROS.  It says, the patient said there are

15  times he cannot hold his urine.  Is that a significant

16  finding to a doctor such as yourself?

17     A.    When you have injury of the spine you always

18  think in terms of bladder control.  Other injuries that

19  can affect the bladder like that.  Other injuries that

20  press the bladder like that coming from the spinal cord

21  that's innervation, means that they're splicing the

22  bladder.

23     Q.    Is that something that's often seen in a case of

24  a disk herniation?

25     A.    It's one of the symptoms of disk herniation, not

Page 106

1    always, but it's one of the symptoms of disk herniation,

2    pressing on certain nerves like S1-S4.  That can lead to

3    that.

4        Q.   So that is another objective sign of disk

5    herniation?

6        A.   It is indicative of disk herniation:  Interfering

7    with the bladder function.

8                MR. CRANE:  Thank you, Doctor.  Pass the

9    witness.

10                MR. KASPERITIS:  Your Honor, at this time, I

11    would move for the admission of Defendant's 1 through 10

12    before passing the witness.

13                THE COURT:  Any objections?

14                MR. CRANE:  Yes, your Honor, that would be

15    repetitive.  We've already admitted the entire records.

16    To admit just pieces of them would be unnecessary because

17    the others are in and also it would be like marking

18    particular portions of the exhibits that are in and it

19    would draw particular attention to that part of the

20    exhibit.

21                THE COURT:  I'm going to overrule your

22    objection and admit Exhibits 1 through 9.

23                MR. KASPERITIS:  9 is the binder and Exhibit

24    10 is the Doctor's curriculum vitae.

25                Your Honor, I pass the witness at this time.

Page 107

1    I have no further questions.

2            THE COURT:  All right.  This is a good time

3    to break for the evening then.

4                (Requested excerpt of trial

5    transcript concluded at this point.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25